**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Jason Joy & Associates, PLLC d/b/a Jason J. Joy & Associates, PLLC; Jason J. Joy, and Colin G. Wood, | Civil No. |
| *Plaintiffs,* v. | **COMPLAINT** Jury Trial Demanded |
| Ravi K. Sangisetty, Jean-Paul Phillip Coussan, Tanner Daniel Magee, William Dow Boyles, Amanda Joy Olmsted, Brooke Bond Long, Matthew H. Long, Landry Magee, LLC, Andrus, Boudreaux, Landry & Coussan, A Professional Law Corporation; and John Does 1–50, | |
| *Defendants.* | |

Plaintiffs allege the following upon actual knowledge with respect to themselves and their own acts and upon information and belief as to all other matters:

## NATURE OF THE ACTION

Plaintiffs Jason Joy & Associates, PLLC d/b/a Jason J. Joy & Associates, PLLC, Mr. Jason J. Joy, and Mr. Colin G. Wood bring this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and pendent Texas law for damages, treble damages, an accounting, and injunctive relief arising from a coordinated scheme by Defendants Ravi K. Sangisetty, Jean-Paul Phillip Coussan, Tanner Daniel Magee, William Dow Boyles, Amanda Joy

Plaintiffs' Complaint                                                        Page **1** of **111**

Olmsted, Brooke Bond Long, Matthew H. Long, Landry Magee, LLC, and Andrus, Boudreaux, Landry & Coussan, A Professional Law Corporation, and their associates to acquire and exercise control over a docket of approximately 1,000 Louisiana hurricane cases for clients that put their faith, trust, and confidence in Plaintiffs to prosecute and that Plaintiffs originated, financed, organized, and jointly represented after the March 2023 collapse of a non-party law firm, McClenny Moseley & Associates PLLC ("MMA"). In their scheme, Defendants diverted, withheld, and converted the contractual fee interests, costs advanced by Plaintiffs, costs owed to a litigation support vendor, and settlement proceeds associated with those cases.

This case involves a shakedown by a cabal of politically powerful south Louisiana lawyers who sought to line their own pockets off the backs of some 1,000 storm client victims. Those clients were already victims three times over: first, they were victims of the historically destructive storm seasons of 2020–2021; then they were victims of their property insurers that unfairly denied, delayed, and/or underpaid their claims; then they were victims of MMA, a Houston-based law firm that signed them and 14,000 others through unethical channels and then collapsed in disgrace, leaving them without counsel on the eve of impending limitations deadlines.

These hurricane survivors fought their way through catastrophic property losses, a broken insurance-claims system, and a corrupt law firm before finding their way to Joy. They sought Joy out, retained JJJ (Joy's law firm) by name, and

placed their faith and trust in Joy as their attorney. And, now incredibly, a fourth time those same clients were victims of Defendants, who exploited the MMA catastrophe to seize control of an extraordinarily valuable litigation portfolio that Joy and his firm had built from nothing by systematically stripping those clients of that choice—without their knowledge and without their consent—and settling their cases for a fraction of those case's value for no purpose other than greed.

The scheme arose in the wake of a Louisiana Supreme Court suspension of MMA lawyers for their unethical practices, leaving thousands of Louisiana storm victim claimants without counsel days before the Hurricane Ida limitations deadline and at imminent risk of losing legal rights. Joy was asked to step in and assume representation of the unrepresented former MMA clients to salvage as many claims as possible. He agreed. JJJ then advanced hundreds of thousands of dollars in costs and committed substantial firm resources building out the infrastructure to identify, retain, and supervise the representation of approximately 1,000 former MMA clients using Joy's experience in high-volume catastrophe and mass-tort experience. JJJ rescued abandoned hurricane victims from legal jeopardy by reducing a chaotic patchwork of orphaned claims into an organized, viable, and valuable litigation portfolio.

Defendants watched as JJJ undertook the risk, cost, and effort while they plotted behind the scenes to move themselves into a position where they could appropriate the gains for themselves. Coussan—Joy's brother-in-law—had introduced Joy to Sangisetty and Magee at a June 2023 meeting with the court-

Plaintiffs' Complaint                                                    Page **3** of **111**

appointed Special Master and urged Joy to rely on a co-counsel arrangement Coussan had assembled. JJJ agreed. Once the docket became valuable, Defendants demanded that Joy surrender part of JJJ's contractual fee interest to lawyers and firms that no client had retained. And when Joy resisted, they repeatedly attempted to extort the concession through threats of reputational harm. Defendants then pivoted from pressure to exclusion by abandoning JJJ's case-management platform, secreting case and settlement information before locking JJJ out of client files entirely, omitting JJJ from disbursement statements, and falsely telling jointly represented clients that JJJ—their chosen counsel—"cannot represent" them.

This is not a mere fee dispute among lawyers. Defendants engaged in a coordinated scheme to convert an active litigation portfolio comprising nearly 1,000 vulnerable storm claimant clients into a vehicle for diverting the representation of those clients from the firm that originated and financed the portfolio while isolating those clients from their chosen counsel. Those clients were not just stripped of their choice without their knowledge or consent, they were left in the hands of lawyers they had not chosen, pressured into settlements far below the value of their claims by those lawyers, and told—falsely—that the counsel they had retained lacked authority to represent them.

## PARTIES

### A.　Plaintiffs

1.　Plaintiff **Jason Joy & Associates, PLLC**, doing business as Jason J. Joy & Associates, PLLC ("JJJ") is a Texas professional limited liability company with its principal place of business in Houston, Harris County, Texas. JJJ is a plaintiffs' litigation firm that has represented large numbers of individual victims injured and/or with losses in catastrophic events and other complex matters across multiple jurisdictions.

2.　Plaintiff **Jason J. Joy** is an individual and citizen of Texas who resides in Harris County, Texas. Joy is the founder and managing member of JJJ.

3.　Plaintiff **Colin G. Wood** is an individual residing in Harris County, Texas, and is a citizen of the State of Texas. Wood is admitted to the State Bar of Texas (Bar No. 24082535) and is a senior attorney with JJJ. Wood was substantially involved in the representation of former MMA clients and the supervision of the docket described in this Complaint. Wood is a "person" within the meaning of 18 U.S.C. § 1961(3) and has suffered injury to his business and property within the meaning of 18 U.S.C. § 1964(c).

### B.　Defendants and Their Associates

4.　Defendant **Ravi K. Sangisetty** is an individual citizen of Louisiana residing in Orleans Parish. He is licensed to practice law in Louisiana (Bar No. 30709) and, per the public filings of the Louisiana Secretary of State (Charter No.

40395619K), is the managing member of non-party Sangisetty Law Firm, LLC ("SLF"), a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana, and a medical malpractice lawyer. Sangisetty attended LSU Law School with Defendants Coussan and Magee. Sangisetty served as legal counsel to JJJ in connection with the June 22, 2023 Secondment Agreement, entered into the July 2, 2023 Joint Venture Agreement with JJJ, and traveled to Houston, Texas on January 23, 2024 to participate in an in-person meeting concerning the matters at issue. Sangisetty is a "person" within the meaning of 18 U.S.C. § 1961(3) and is sued in his individual capacity. Sangisetty is subject to personal jurisdiction in this Court under 18 U.S.C. § 1965(b) and, in the alternative, under the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, consistent with due process.

5.     Defendant **Jean-Paul Phillip Coussan** is an individual and citizen of Louisiana who resides in Lafayette Parish, Louisiana. Coussan is a Louisiana lawyer and partner with a real-estate/title-oriented practice. Coussan also served as a powerful member of the Louisiana Legislature, later served in the Louisiana Senate, and was elected to the Louisiana Public Service Commission ("LPSC") in November 2024. LPSC membership provides extraordinary public influence opportunities, with four such members subsequently becoming Louisiana governor. Coussan attended LSU Law School with Sangisetty and Magee. Coussan is also Joy's brother-in-law. Coussan introduced Joy to Sangisetty and Magee following a meeting in Lake Charles with the Special Master, urged Joy to

rely on the arrangement Coussan had assembled, and later pressured then attempted to extort Joy to surrender portions of JJJ's contractual and economic interests.

6.      Defendant **Tanner Daniel Magee** is an individual and citizen of Louisiana who, on information and belief, resides in Terrebonne Parish, Louisiana. Magee is a Louisiana lawyer and a named partner with Landry Magee LLC, where he practices criminal defense part-time. Magee also served as Speaker Pro Tempore of the Louisiana House of Representatives—one of the most powerful elected positions in the State of Louisiana. Magee attended LSU Law School with Sangisetty and Coussan. Magee participated in the pressure campaign against Joy, claimed authority over matters in which he was not identified in the governing client contracts, and later participated in the exclusion of JJJ from the former MMA docket.

7.      Defendant **William Dow Boyles** is an individual and citizen of Louisiana who, on information and belief, resides in Orleans Parish, Louisiana. Boyles is a Louisiana lawyer associated with SLF. As alleged herein, Boyles was used to communicate with jointly represented clients, push low-value settlements, and repeat the false claim that JJJ could not represent clients because JJJ is a Texas firm.

8.      Defendant **Amanda Joy Olmsted** is an individual and citizen of Louisiana who, on information and belief, resides in Orleans Parish, Louisiana. Olmsted is a Louisiana lawyer employed by or associated with SLF. Olmsted

participated in the handling of former MMA matters and in the conduct by which JJJ was excluded from files, settlements, and related information.

9. Defendant **Brooke Bond Long** ("B. Long") is an individual and citizen of Louisiana who, on information and belief, resides in Orleans Parish, Louisiana. B. Long is a Louisiana lawyer employed by or associated with SLF. B. Long participated in the handling of former MMA matters and in the operational conduct by which JJJ was cut off from information and meaningful participation in jointly represented cases.

10. Defendant **Matthew H. Long** ("M. Long") is an individual and citizen of Louisiana who, on information and belief, resides in Lafayette Parish, Louisiana. M. Long is a Louisiana lawyer who, on information and belief, is associated with Andrus, Boudreaux, Landry & Coussan, A Professional Law Corporation. M. Long participated in the operations surrounding the former MMA docket while JJJ was being excluded from fees, files, and client access.

11. Defendant **Landry Magee, LLC** is a Louisiana limited liability company with its principal place of business in Louisiana. On information and belief, Landry Magee is a law firm associated with Magee. Landry Magee was used as part of the broader arrangement through which Magee asserted involvement in the former MMA matters and related fee interests.

12. Defendant **Andrus, Boudreaux, Landry & Coussan, A Professional Law Corporation** ("ABLC") is a Louisiana professional law

corporation with its principal place of business in Louisiana. On information and belief, ABLC is the law firm with which Coussan is associated. ABLC was used as part of the broader arrangement through which Coussan and related actors participated in the conduct described in this Complaint.

13.    Non-party associate of Defendants **Julian Correa** is an individual and citizen of Louisiana who, on information and belief, resides in Orleans Parish, Louisiana. Correa is a paralegal employed by SLF. Correa participated in client-contact and settlement-related communications in furtherance of the conduct described herein. While not sued as a Defendant at this time, Plaintiffs believe discovery will uncover sufficient facts to name Correa as a Defendant.

14.    Non-party associate of Defendants **Kourtney Comeaux** is an individual and citizen of Louisiana who, on information and belief, resides in Lafayette Parish, Louisiana. Comeaux is a closing professional employed by or associated with Andrus, Boudreaux, Landry & Coussan, A Professional Law Corporation and related business operations. Comeaux participated in scheduling and operational functions concerning the former MMA docket and related proceedings. While not sued as a Defendant at this time, Plaintiffs believe discovery will uncover sufficient facts to name Comeaux as a Defendant.

15.    Plaintiffs also sue John Does 1–50, whose true names and capacities are presently unknown. These Doe defendants participated in, facilitated, directed, or knowingly benefited from the conduct described herein, and Plaintiffs will amend this Complaint to identify them when their identities are discovered.

Plaintiffs' Complaint                                                      Page **9** of **111**

16. Defendants and their employees, members, and agents participated personally in the unlawful conduct alleged in this Complaint. To the extent any Defendant did not personally participate in a particular act, he, she, or it authorized, acquiesced in, ratified, or otherwise enabled the conduct.

## JURISDICTION AND VENUE

17. This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

18. This Court also has jurisdiction over Plaintiffs' civil RICO claims under 18 U.S.C. § 1964(c) because Plaintiffs seek relief for injury to their business and property by reason of violations of 18 U.S.C. § 1962.

19. This Court has supplemental jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy and arise from the same nucleus of operative facts as Plaintiffs' federal claims.

20. This Court also has diversity jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1332(a) because there is a complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. JJJ's principal place of business is in Harris County, Texas; the co-counsel and joint-venture relationships at issue were formed, negotiated, managed, and supervised in substantial part in Houston; Defendants directed wire communications into this District in furtherance of the conduct alleged; Defendants Sangisetty, Coussan, and Magee traveled to Houston in furtherance of the scheme as further described in this Complaint; the funds and economic interests at issue were managed from, owed to, or suffered in this District; and a substantial portion of the legal, administrative, and supervisory work described in this Complaint was performed by JJJ in Houston.

22.     Venue is also proper under 18 U.S.C. § 1965(a) because each defendant transacts affairs in this District through the conduct alleged.

23.     The Court has personal jurisdiction over each Defendant. Each Defendant purposefully directed conduct toward Texas and purposefully availed himself, herself, or itself of the privilege of conducting activities in Texas, including by:

a.     Sangisetty entered into an attorney-client relationship with Joy, a Texas resident, in negotiating the June 22, 2023 MMA-JJJ Secondment Agreement; thereafter entered into the July 2, 2023 Joint Venture Agreement with JJJ, a Texas firm; transmitted numerous text messages, emails, and other wire communications to

Joy and JJJ personnel in Texas; and traveled to Houston in January 2024 to meet with Joy.

b.   Coussan introduced Joy to Sangisetty and Magee; transmitted text messages and emails to Joy in Texas including the August 21–22, 2023 "stay the course" texts, the December 26, 2023 fee demand, and the May 2025 "buyout" demand; and traveled to Houston in January 2024 to demand portions of JJJ's contractual fee interest.

c.   Magee transmitted text messages and emails to Joy in Texas including the July 2024 "unsustainable" email, the September 16, 2024 group text exchange, and the March 11, 2025 confirmation that the exclusion was "ongoing," and traveled to Houston in January 2024.

d.   Boyles transmitted emails to JJJ in Texas, including the November 20, 2024 email accusing JJJ of "breathing poison" in Client D's ear and the January 8 and February 10, 2025 emails to Client B (each copied to JJJ in Texas).

e.   Olmsted, B. Long, Correa, M. Long, and Comeaux each transmitted communications to JJJ personnel in Texas, participated in the handling of jointly represented matters in which JJJ was joint counsel from Texas, and accepted or distributed funds in which JJJ held a contractual interest as a Texas firm.

f.  Landry Magee, LLC and ABLC each conducted business with JJJ in Texas through their principals, accepted communications from JJJ in Texas, and benefited from the conduct directed at JJJ in Texas.

24.  To the extent any Defendant is not subject to traditional minimum-contacts jurisdiction in this District, the Court may exercise nationwide personal jurisdiction under 18 U.S.C. § 1965(b) and (d) because at least one Defendant is subject to personal jurisdiction here and the ends of justice require that all Defendants be brought before a single court.

25.  Plaintiffs identify the following related proceedings:

a.  *In re McClenny Moseley & Associates, PLLC*, Case No. 24-bk-31596 (Bankr. S.D. Tex.), the MMA bankruptcy proceeding;

b.  *MMA Law Firm, PLLC v. Sangisetty Law Firm, LLC*, Adversary Proceeding No. 24-03230, later associated with Civil Action No. 4:25-cv-00318 (S.D. Tex.), proceedings arising from disputes concerning former MMA matters and related fee interests;

c.  *Sangisetty Law Firm, LLC v. Jason Joy & Associates, PLLC*, Civil Action No. 2:25-cv-01561 (E.D. La.), litigation filed by non-party SLF against JJJ; and

d.  *Sangisetty Law Firm, LLC v. Xpand Legal, LLC,* No. 0200581-C, Div. C (La. 32d Jud. Dist. Ct., Terrebonne Parish filed Aug. 14, 2024).

### ARBITRATION/CONSENT TO STAY

26. On July 2, 2023, JJJ and SLF entered into a Joint Venture Agreement.

27. The Joint Venture Agreement contains a mandatory arbitration clause.

28. On or about February 26, 2025, SLF filed suit against JJJ, *Sangisetty Law Firm, LLC v. Jason Joy & Associates*, Case No.: 201933, Div. "D," 32nd District Court for the Parish of Terrebonne, Louisiana.

29. JJJ removed the litigation to the United States District Court for the Eastern District of Louisiana, *Sangisetty Law Firm, LLC v. Jason Joy & Associates, PLLC*, Civil Action No. 2:25-cv-01561 (E.D. La.).

30. On February 23, 2026, the court found the litigation fell within the scope of the mandatory arbitration clause, stayed the litigation, and compelled SLF to initiate arbitration.

31. To date, SLF has not initiated arbitration.

32. The Defendants in this matter are non-signatories to the agreement to arbitrate. It is unknown whether these non-signatories intend to participate in the court ordered arbitration.

33. JJJ does not intend to waive its right to invoke the mandatory arbitration clause as to its dispute with SLF or in any way bypass the arbitration order.

34. JJJ's claims, however, are subject to time limitations which are not tolled by arbitration.

35. Accordingly, JJJ files this complaint to ensure its claims are brought within any applicable limitations period in the event some or all of its claims are not resolved by arbitration but consents to a stay of this litigation pending arbitration.

36. JJJ acts in accordance with the directive from the United States Court of Appeal for the Fifth Circuit in *Fonseca v. USG Ins. Servs., Inc.*, 467 F. App'x 260, 261 (5th Cir. 2012), which provided, in pertinent part:

> [W]e held that a claimant who demanded arbitration is not required to wait until the outcome of the arbitration to file a lawsuit. In this case, [plaintiff] could have (and should have) filed her suit within the statute of limitations and, thereafter, sought a stay of the action pending arbitration. Such a course would have guaranteed that the lawsuit was brought within the limitations period without waiving any right to arbitration which may have existed.

## SUBSTANTIVE ALLEGATIONS

### The Historic 2020–21 Storm Crisis and MMA Disaster

37. In a span of 367 days, residents of Louisiana endured five historically powerful and destructive natural disasters: Hurricane Laura (August 27, 2020), Hurricane Delta (October 9, 2020), Hurricane Zeta (October 28, 2020), Winter Storm Uri (February 13–17, 2021), and Hurricane Ida (August 29, 2021). These storms caused catastrophic and widespread damage to homes, businesses, farms, and whole communities across large portions of the state, with particularly concentrated losses in Southwest and Southeast Louisiana.

38.     These disasters generated an extraordinary volume of first-party property insurance claims—more than 1,000,000. For the victims, the nightmare continued as they encountered a claims-handling system marked by endless delay, underpayment, confusion, and unconscionable claims practices—all against the backdrop of the COVID-19 pandemic and historically high construction and repair costs. Adding to the misery: twelve property and homeowners' insurance companies operating in Louisiana were later declared insolvent. This environment created urgent demand for legal representation and a uniquely large and vulnerable population of hurricane victims.

39.     Into that chaos stepped MMA, armed with over $35 million in "litigation finance" dollars. With these seemingly limitless funds, MMA aggressively marketed legal services to this population through means and channels later admitted and deemed to be illegal and/or unethical.

40.     MMA acquired a staggering 15,000 storm victim clients, but the firm lacked the experience, staffing, and systems necessary to handle a docket of that size. Moseley himself admitted that acquiring "15,000 claims in less than two years" was "kind of insane."

41.     By March 2023, after a series of evidentiary hearings, the Louisiana state and federal courts concluded that MMA had engaged in wide-ranging professional misconduct, and MMA's attorneys were suspended from practicing in

Louisiana. Chief Magistrate Judge Michael B. North of the U.S. District Court for the Eastern District of Louisiana found:

> [MMA] and in particular Zach Moseley, have engaged in a pattern of misconduct on a scale likely never before seen here. . . . They have undertaken a brazen, multi-faceted campaign to enrich themselves with ill-gotten contingency fees. . . . They have lied . . . claiming to represent [insureds] who had never heard of [MMA], . . . they have filed lawsuits on behalf of people they knew they did not represent, . . . they have failed to disclose known conflicts to clients; and they have lied to the judge in open court. If only this were hyperbole—alas, it is all established fact. . . . I have never seen a clearer or more shameless series of violations of Federal Rule of Civil Procedure 11 and the Rules of Professional Conduct. . . . Zach Moseley, and McClenny, Moseley & Associates have been nothing less than a scourge on this State and its citizens, the Court, and the Bar.

*Franatovich v. Hartford*, 2023 WL 7005861, at *1 (E.D. La. Oct. 24, 2023).

42.     Judge North asked "What will be the ultimate impact of the violations and misconduct catalogued here on . . . the policy holders of this District?" This lawsuit answers that question: because as catastrophic as MMA's conduct was, it did not mark the end of the harm inflicted on Louisiana's hurricane victims. It marked the beginning of a second, more insidious phase carried out by a homegrown syndicate of politically powerful lawyers who systematically exploited this catastrophe to line their own pockets at the expense of the very storm victims they maneuvered themselves into representing.

43.     MMA's ouster in March 2023 left these thousands of storm claimants in procedural limbo, exposed to approaching limitations deadlines.

44. On the evening of June 6, 2023, Zachary Moseley phoned Joy. Joy had not previously met or heard of Moseley. Moseley explained that roughly half of MMA's former Louisiana clients remained unrepresented and were at imminent risk of losing legal rights. He asked Joy, a third-generation trial lawyer, to step in.

45. Joy was the right lawyer to call. Joy and his firm have successfully represented thousands of Louisiana residents and businesses in a variety of complex, high-stakes cases arising out of both single-event and mass catastrophe events. Equally important, Moseley knew that Joy and his firm had the financial resources, the experience, know-how, and infrastructure to take on a mass rescue operation of unprecedented scope, and under extreme time constraints. JJJ conducted substantial due diligence on MMA's situation before agreeing to step in, including a detailed investigation of MMA's widespread misconduct and credible allegations of criminal activity spanning multiple states. It was clear that without JJJ's intervention, a substantial number of victims would have their valuable legal claims extinguished through no fault of their own.

46. Moseley outlined a plan under which MMA would transfer a large block of case files to JJJ for review. For cases JJJ was willing to accept, MMA would obtain a newly executed contingency fee agreement from each client. JJJ would set aside a specified percentage of fees in a controlled account to which MMA could later assert a claim in a judicial proceeding. JJJ would also purchase the SmartAdvocate CRM, a cloud-based case management system recommended

by Moseley to ensure prompt and efficient electronic transfer of case data and documents from MMA's case management system, which utilized the same software. This plan would have been a largely turnkey arrangement without substantial up-front investment by JJJ.

47.     As part of his due diligence, on June 20, 2023, Joy attended a meeting at the federal courthouse in Lake Charles, Louisiana with Special Master Cade Cole and others involved in the hurricane litigation and MMA fallout. Special Master Cole explained the scope of MMA's misconduct, the reasons prior rescue efforts had failed, and the requirements for successor firms willing to assume representation of former MMA clients. Special Master Cole emphasized that successor clients required new contingency fee agreements, that MMA could play no continuing role in the litigation, and that successor firms needed a written agreement with MMA. He also underscored the urgency created by the approaching Hurricane Ida limitations deadline and various orders issued by the Western District of Louisiana in the underlying storm litigation.

### Secondment Agreement and Operative Client Contracts

48.     Coussan, Joy's brother-in-law, also attended the June 20, 2023 Lake Charles meeting and afterward introduced Joy to Sangisetty and Magee. Joy had not previously met either. Coussan discouraged Joy from retaining different Louisiana counsel or opening a JJJ Louisiana office. Joy trusted Coussan. At the time, he was not aware that Coussan, Sangisetty, and Magee had attended law school together and ever since had maintained a very close professional and

personal relationship. He was also not aware that Sangisetty and Magee grew up across the street from one another in Terrebonne Parish.

### A.    *Sangisetty volunteered to represent JJJ in negotiating and drafting the Secondment Agreement*

49.    After the Lake Charles meeting, Sangisetty offered to represent JJJ in negotiating and drafting the written agreement with MMA that Special Master Cole had recommended. Coussan urged Joy to trust Sangisetty and move quickly given the approaching Hurricane Ida deadline and a number of pending federal cases. Trusting Coussan, Joy retained Sangisetty.

50.    Acting as JJJ's lawyer, Sangisetty negotiated and drafted the June 22, 2023 MMA-JJJ Secondment Agreement. Under that agreement, JJJ agreed to set aside 45% of the contingency fees generated on former MMA matters in a JJJ-controlled account (the "Holdback"), preserving MMA's asserted claim to no more than that amount while leaving the remaining 55% available for immediate distribution to JJJ and any co-counsel. JJJ would not have undertaken this former MMA hurricane-case rescue project without the Holdback.

51.    In negotiating the Secondment Agreement on behalf of Joy, Sangisetty obtained access to confidential JJJ information, including Joy's strategic thinking, the economics of the proposed rescue effort, and JJJ's internal plans, assessments, and methodologies. Significantly, Sangisetty learned that the estimated aggregate value of the unrepresented MMA cases at issue exceeded $400,000,000.00 and that JJJ planned to finance and fund the project. Sangisetty

would soon exploit this proprietary and highly confidential client information, obtained solely by virtue of his attorney-client relationship with Joy, to enrich himself and his co-conspirators through the unlawful enterprise.

> **B.    *Coussan and Magee decline to enter the Secondment Agreement***

52.    Because JJJ did not then employ Louisiana-licensed attorneys, it needed Louisiana co-counsel to assist with filings, appearances, and case-specific litigation tasks as the Hurricane Ida limitations deadline approached and pending lawsuits were subject to imminent dismissal. At the time, JJJ did not have a Louisiana branch. Joy began planning to open JJJ's first Louisiana office in his native Lafayette staffed by Louisiana-licensed attorneys that he would hire. However, Coussan urged Joy not to open a Louisiana office and to instead work with Coussan, Magee, and Sangisetty.

53.    Joy explored potential co-counsel relationships with Louisiana-based firms and attorneys including Coussan, Magee, and Sangisetty, among other firms and lawyers. From the outset, Joy advised that a co-counsel relationship would need to be specified in written agreements between JJJ and co-counsel. Joy also advised that all firms involved in a client's representation would need to be identified in the client fee agreements, with the division of contingency attorney fees between each firm, signed by the client as required by the Texas Disciplinary Rules of Professional Conduct.

54.    Joy invited Sangisetty, Coussan, and Magee to join the Secondment Agreement and assume shared liability for the project. Each declined. Coussan and Magee cited political and firm-level reasons for declining. Coussan said his firm's partners "don't want the exposure" and "can't do work and commit resources without getting paid first." Magee said his firm did not want to be "tainted" by "working with Moseley or MMA." Sangisetty said it would be "a blatant ethics violation" for SLF to be both JJJ's lawyer and a party to the same transaction.

55.    Coussan and Magee also declined to enter into a co-counsel agreement. Sangisetty agreed and represented that he could obtain quick judicial approval for MMA to initiate the contemplated file transfers. At the time, Joy did not know that Defendants were positioning Sangisetty as the operational hinge that would allow them to later commandeer the client relationships and docket that JJJ developed.

### C.    *Sangisetty falsely claims specific fee splits are illegal in Louisiana*

56.    On June 28, 2023, in his first ever substantive text message to Joy, Sangisetty stated: "*I'm going to work on the JV this evening. I saw your document that is essentially the same as mine. The only thing is that we can't explicitly share fees in Louisiana pursuant to a JV since it's not a class action.*" Sangisetty reinforced that position in calls on June 29 and July 2, 2023, contending that "recent changes" in Louisiana law prevented firms like SLF from agreeing to a specific division of contingent fees. The representation was false.

D.    *JJJ and Sangisetty enter the JJJ-SLF Joint Venture Agreement*

57.    On July 2, 2023, relying on Sangisetty's representations about judicial approval and Louisiana fee-sharing law, Joy executed a two-page Joint Venture Agreement with Sangisetty. The agreement recognized that JJJ sought to associate Louisiana counsel to assist in prosecuting client claims. It did not fix a fee division; the parties agreed to allocate fees on a client-by-client basis through the individual contingency-fee agreements ("CFAs"). The agreement included a mutual indemnity provision under which each firm remained responsible for harm caused by its own misconduct or negligence.

58.    Joy and Sangisetty also came to the understanding that Joy would handle the MMA and Moseley-related "sphere of issues" including any Texas-based litigation. Also, as it was Joy's project, Joy and JJJ would also supervise the overall project, while Sangisetty and his firm would principally handle Louisiana filings, appearances, mediations, and other case-specific "last mile" litigation tasks. To the extent Sangisetty required assistance, Joy would promptly supply it.

E.    *The fall-back approach was a more difficult process and led to supplemental understandings*

59.    Sangisetty did not obtain the judicial approval that Sangisetty assured Joy was a "done deal." As July 2023 progressed and the Hurricane Ida deadline drew nearer, and more pending lawsuits were dismissed by Louisiana

courts, Sangisetty was forced to admit that the contemplated transfer process was not going to happen in time.

60.    Rather than abandoning the rescue project, Joy built the rescue docket directly through JJJ-funded state bar approved direct solicitation efforts. This fall-back approach was significantly more expensive, more labor-intensive, and more operationally demanding than the transfer arrangement originally contemplated by and outlined in the Secondment Agreement.

61.    In August, Coussan repeatedly warned Joy not to move away from the "team" Coussan had unilaterally assembled even though that "team" had refused to enter into the agreements. On August 21, 2023, after Joy expressed his reservations about continuing the joint venture with SLF, Coussan texted Joy:

> *Stay the course. Get more cases signed up. Let our first group handle them. It will be done right and you will stay out of trouble in Louisiana to live to fight for the next storms or mass torts. You start getting a bunch of other people involved your name will be spread around negatively.*

62.    Joy took the statements seriously, as Coussan was not merely a family connection, but a politically powerful Louisiana lawyer telling him, in substance, that deviating from Coussan's vague and unsolicited arrangement would create problems for Joy in Louisiana—he might not "live to fight" another day.

63.    Joy again offered to create a joint venture arrangement with both Coussan and Magee. But neither Coussan nor Magee (or their respective firms) were willing to co-counsel any of the ex-MMA cases.

64.    On August 30, 2023, the day after the Hurricane Ida limitations deadline, Joy informed Coussan that JJJ would not be continuing to work with SLF as to new matters.

65.    JJJ had several concerns. Plus, JJJ did not need Sangisetty, or the vague involvement of Coussan or Magee—his clients would be better served, and more efficiently, without their involvement.

66.    Sangisetty and Coussan urged Joy to reconsider his decision to move forward independently. After a number of detailed phone calls and frank discussions, Joy agreed to continue working with Sangisetty only on the conditions that (a) a revised CFA template drafted by JJJ's Texas ethics counsel would govern all clients retained after the Ida deadline; (b) the revised CFA would fix a 50/50 fee division between JJJ and SLF; (c) the revised CFA would require written client consent before any additional lawyer or firm could participate; and (d) the revised CFA would require transparency in settlement disbursements. Sangisetty accepted those conditions.

---

1.    At one point, Joy understood Landry Magee, LLC would be co-counsel with JJJ on at least one block of cases located in the Houma area, but Mr. Magee then went silent and would not answer or return Joy's calls.

67.    The revised CFA provided that, in the event of a recovery, the firms would divide the contingency fee evenly on a 50/50 basis, expressly invoked Texas Disciplinary Rule of Professional Conduct 1.04 to define joint responsibility for the representation, and addressed Sangisetty's untenable claim that Louisiana law prohibited an express fee division.

68.    In total, approximately 1,000 former MMA clients retained JJJ and SLF under written CFAs that named the two firms as joint counsel, fixed (in the revised CFA) a 50/50 fee division, required client consent for additional counsel, and required transparency in settlement disbursements. No client retained Coussan, Magee, Landry Magee, or ABLC, nor did any CFA identify them as participating counsel.

  

### CONTINGENCY FEE AGREEMENT

Under this Agreement, I, _____ (hereinafter, the "**Client**" or "**I**") retain **Jason J. Joy & Associates law firm** and the **Sangisetty Law Firm, LLC** (collectively, hereinafter, the "**Firms**" or "**Attorneys**") to act as Client's attorneys to prosecute legal claims against Client's insurance company(s) for damages arising out of natural disasters in 2020-2021 including Hurricane(s) Laura, Delta, Zeta, and/or Ida, and to pursue any other remedies that may be available under applicable law. This representation does not include the appeal of an adverse judgment against Client; however, Attorneys and Client may, if they choose, enter into a new written Agreement with respect to any appeals.

Client specifically authorizes the Attorneys to investigate Client's claims and, if appropriate, undertake negotiations and/or file and prosecute a lawsuit, enter an appearance in Client's case or if appropriate, initiate legal proceedings on Client's behalf. Client agrees to a joint representation by Jason J. Joy & Associates ("JJJ") and Sangisetty Law Firm, LLC ("SLF") who will represent Client in accordance with the applicable rules of professional conduct and assume "joint responsibility"[1] for Client's case. In the event of a successful recovery the Firms shall split the contingency fee evenly, on a 50/50 basis. If Attorneys determine that additional law firms may be needed for Client's representation, Attorneys will disclose that fact in advance and seek Client's advance consent to any such additional associated law firms.

_____

[1] As that term is defined in Rule 1.04, Texas Disciplinary Rules of Professional Conduct and its official Comments.

### JJJ's Performance: Origination, Financing, and Supervision

69.    Based on the agreement above, JJJ moved forward with sourcing and signing each client through JJJ-funded solicitation efforts and intake operating from JJJ's Houston office. Joy and senior JJJ personnel personally spoke with the overwhelming majority of the clients who ultimately retained JJJ and SLF. Between September 2023 and March 2024, approximately 800 additional former MMA clients executed the revised CFA.

70.    JJJ funded the project by advancing more than $300,000 of out-of-pocket costs and expenses through September 2024 for the benefit of the joint venture and the jointly represented clients, including marketing and solicitation costs; printing and postage for thousands of state-bar-compliant solicitation letters; SmartAdvocate case-management licensing and implementation; outside Texas ethics counsel; outside bankruptcy-related counsel; staffing support; filing fees; and other operational expenses necessary to originate, organize, and supervise the docket.

71.    SLF did not finance any material portion of those expenditures. Sangisetty advised Joy that SLF was not in a financial position to meaningfully contribute to the project; he said he could not even fund the initial printing and postage costs for the first round of solicitation letters, a cost of about $5,000. Indeed, in August 2023 and September 2023, JJJ directly advanced Sangisetty *at least* $75,000 in cash, alone, for purposes of the litigation. JJJ also took on

substantially all of the work, assigning multiple senior attorneys and litigation paralegals to the venture from the outset.

72.    As joint counsel under written CFAs incorporating Texas Disciplinary Rule 1.04, JJJ assumed joint responsibility for the representation of the former MMA clients. That joint responsibility carried a duty to supervise SLF's performance on jointly retained matters. *See* Tex. Disciplinary R. Prof'l Conduct 1.04 cmts. 13–14.

73.    JJJ purchased, configured, and implemented the SmartAdvocate case-management system for the JJJ-SLF joint venture so that client and case data, deadlines, documents, and status information could be centrally accessed across the docket among multiple firms. JJJ established standard operating procedures, workflows, status categories, calendaring protocols, and reporting tools. JJJ paralegal Bree Miller also built and provided to Sangisetty a detailed deadline-tracking tutorial and calendar export demonstrating how JJJ's system tracked deadlines and case status across the docket.

74.    Multiple JJJ attorneys and senior paralegals were assigned to the former MMA matters, including plaintiff Wood, Kathleen O'Connor, Alexandre Petit, Bree Miller, Jennifer Shea, Annette Aguilar, and others working under Joy's direct supervision. Their work included, among other things: reviewing dockets across multiple federal and state courts; identifying matters requiring enrollment, substitution, refiling, or corrective action; preparing pleadings, motions, subpoenas, mediation materials, and initial disclosures; auditing files for

venue and status; monitoring PACER and other dockets for deadlines; tracking settlements; and coordinating with clients and co-counsel.

### Defendants Wrest Control and Conduct a Pressure Campaign

75.     With time, Joy suspected that Sangisetty was operating in bad faith. JJJ personnel reported that SLF was not sharing basic case-specific information, including file-stamped pleadings and updated litigation information.

76.     Joy texted Coussan: *"I know [Sangisetty and SLF] are trying to limit my firm's participation in order to make a greater claim for fee percentage and that's insidious and needs to stop."*

77.     But the efforts to limit JJJ's participation and supervision did not stop and, it turned out, Coussan, along with Magee, actively advanced those exclusionary efforts.

78.     On December 26, 2023, Coussan re-emerged and asserted that the project should be split among Coussan, Sangisetty, Magee, and JJJ. Coussan demanded that Joy transfer 20% of JJJ's attorney's fee interest to Coussan as compensation for an alleged "partnership." Joy refused. He explained that JJJ's fee interest was already committed to the lawyers and staff who had built and worked the docket and that the clients—not Coussan—determined who represented them.

79.    On January 17, 2024, Sangisetty (gray bubbles) engaged in a lengthy text exchange with Joy (blue bubbles) concerning the fee structure and Coussan's demands (redactions to certain law firm names for confidentiality):

1/17/2024 12:03:37 PM

I know this is a frustrating and uncomfortable topic but you & I need to deal with this Jean Paul issue sooner rather than later.
I've spoken to him several times the past week & didn't mince words with my frustration over how he's decided to handle this - it's patently unfair (& frankly, unheard of in the world I've worked in since 2012) to barge in, at this late stage of a project, when all the hardest work & greatest risks have already been assumed, managed and successfully conquered by other people, ie JJJ & Assoc., and also the Sangisetty Firm did some stuff too.
I told JP if he wanted to play a bigger part and getting a bigger fee then it's incumbent upon his firm to make those decisions in the early stages of a project, and then follow through on it every, single, day - with manpower, financial contributions, brainpower & know-how, and everything else that America rewards for taking risks and working ones fingers to the bone....

You're right I'd rather not interfere. But can discuss later today. We decided to 50/50 split it and I would take care of T and you JP.

I obviously don't want this Andrus Boudreaux Coussan APLC distraction to derail or impair what I've built with your assistance over the past few months. I explained to JP that case acquisition and intake efforts are all but complete at this juncture, and all that's left is mop up duty on the storm cases, however maybe he can play a part in the malpractice

You're right we decided 50/50 split, but then you apparently cut JP in on your 50% by involving him in the litigation part

My 50% is 100% accounted for, with JP getting a couple points off the net after I pay all my people and get made whole

YOU cut JP in on YOUR 50% by involving him like you have

You deal with it

I'll help u

I didn't but always have tried to be inclusive

Replying to Ravi Sangisetty, 2024-01-17 13:00:42: « I didn't but always have tried to be inclusive »

Be inclusive with your 50% not mine!

Seriously, - and btw just let me vent a sec here bro - how would you feel if next thing you know I've got Tanners firm on calls and sending them out to do stuff knowing full well they're gonna turn around and point to work we could have done better and cheaper as somehow a basis for a % that's end up being 7-figures

But out of your 50%?! You rightfully be f'ing livid!

It's fine to vent...but we had multiple conversations with you involved about them being involved in mediations and the litigation side

No no no, when I agreed to that it was under the reasonable assumption JPs involvement was 100% done and over with

You sent him and Tanner that text in September about how I, JJJ, lit a "gas bomb and threw it on" something presumably causing a conflagration of sorts....and asking them to get engaged, and then crickets - nobody from those firms did anything meaningful after the Ida deadline (& not much before, either), and even 50/50 was a (very) steep deal for my firm from my perspective - & I'm pointed that out many times since - but I did so under the reasonable assumption JP's firm was no longer involved....AND if JP's firm was to be involved (& what rational plaintiff firm wouldn't want to be at this point?!), IF his cut was coming out of my 50% that necessarily means I've got 100% sole discretion on whether and to what extent to involve them

I think it's worth a call with the group to clarify roles etc. we've got a lot left to do and we are under the gun with the courts and defense bar as far as mma scrutiny.

Plaintiffs' Complaint

The group is you & I, as a matter of law - nobody else is on any contracts, nobody else is liable per se, and I've got the additional albatross of having an MMA-JJJ contract that I'll need to deal with probably for the next few years (& at significant cost, expense & stress). If you need additional help handling (promptly & adequately) the cases that we signed up - & at least 70% were retained by me or someone at my firm, or my brother - it's not a knock on you or your firm as 900 cases is a lot for any solo plaintiffs firm (even yours) to adequately handle in a timely manner....but for 50% of the fees, that's the job (& reasonably so).

My firms got a ton of high level work that still needs to get done on other valuable dockets but I've nevertheless gone out of my way to assist you - my partner - well beyond what was reasonably contemplated by our September 50/50 agreement(& that's when I decided to stick with you and give 'us' a chance & I basically cancelled the JVs I'd made with several other La. firms - Villemarette, Feucht, etc., that were eager to work these relatively easy cases... And remember, MMA's deal w Digger was a 66/34% split, with Digger getting 34% to close out the cases, most of which were already filed and had inspection / reports completed).

In addition to the other contributions I've also allocated significant JJJ attorney & para-professional assets to help out & remove the backlogs and bottle necks - I've even "loaned" you my people, & given u express permission to be a prick if necessary (not a small ask, btw) to crack the whip....so I'm also staffing the litigation side, too.
And that's in addition to me generating this entire, improbable project to begin with, financing well over 50% of it, and using my painful & expensive past experiences and know-how to keep this ex-MMA / La Storm project moving as efficiently and effectively as possible....etc etc.

So weighing all of these indisputable factors (among many others in my favor) in a fair and reasonable and equitable manner, if you want to be inclusive & let Jean Paul's firm play a role in the easiest part of this project then it should come from your 50% interest. If you don't want to share that fee interest, then you need to tell Jean Paul that our ship has already sailed, but perhaps he can assist on the malpractice project. Or, JP can start an Xpand-type company and we agree to hire it on this and related projects (they need to actually do good work).
There's all sorts of ways to deal with this - but it's not coming out of my 50%.

80.    On January 23, 2024, Sangisetty, Coussan, and Magee traveled to Houston unannounced and met with Joy in person. They pressed Joy to surrender a substantial portion of JJJ's contractual fee interest, suggesting during dinner at

Vic & Anthony's restaurant that they could cause an investigation into Joy that would potentially ruin his reputation. Standing his ground, Joy refused.

81.    On January 24, 2024, they tried a different tack at Le Crema restaurant in Midtown Houston: Defendants took responsibility for their prior misconduct and apologized. Joy, looking to finally put an end to this chapter in his relationship with Defendants and instead focus on the best interests of the JJJ-SLF joint ventures and storm clients, offered to pay Coussan a portion of JJJ's net profits on jointly represented matters subject to strict compliance with ethical rules and with the consent of the participating clients. Sangisetty was to pay Magee from his portion of the contingency fees.

82.    When proposing this resolution, Joy relied on Defendants' apology for their prior conduct and assurances that the dispute was resolved and that the JJJ-SLF joint venture was finally on solid footing.

83.    But Defendants' demands did not stop. Rather than taking "no" for an answer and either proceeding in good faith or moving on to other business pursuits, Defendants simply regrouped and played the "long game" while JJJ and Xpand Legal continued to do the most demanding and risky tasks: build out the project infrastructure and finance the entire project. One way or another, Defendants were determined to get their hands on other peoples' money; and they would not stop until they got their way—regardless of how it affected the clients. As detailed in paragraphs 122 through 140 below, there is no reasonable dispute that the clients suffered tremendously because of Defendants' conduct.

Plaintiffs' Complaint                                                    Page **33** of **111**

84.    In July 2024, Joy asked Sangisetty for (i) financial records and client settlement information, (ii) reimbursement of the $300,000 in JV expenses paid to date by JJJ, (iii) the Holdback that Joy had the right and duty to safeguard and hold, and (iv) JJJ's 50% net fee interests to date—all of which JJJ was unquestionably entitled to receive. In response, Defendants sought to buy time and divert attention. On July 24, 2023, Magee sent an email to Messrs, Joy, Coussan and Sangisetty stating that, in his opinion, the "current situation" was "unsustainable," that he was allegedly "working non-stop on these MMA files for little to no financial gain," and that he wanted to discuss the Joy / Sangisetty fee division. Magee, Coussan, and Sangisetty intended this email to serve as a demand that Joy reopen the existing fee structure to compensate Magee.

85.    But Magee's involvement and compensation, if any, was solely a Sangisetty matter per the September 2023 understanding between JJJ and SLF. Additionally, given that Magee was a partner at a different law firm, he could not, for purposes of both Texas and Louisiana Rules of Professional Conduct, work on JJJ cases without obtaining prior written consent from the clients and from Joy's firm.

86.    Joy had already made clear that JJJ's fees were set in stone and would not be revisited under any circumstances. Joy was not opposed to allowing Coussan and/or Magee to work on individual cases, provided they were properly supervised, and the client(s)—and Joy—approved the association as required by the CFAs, Texas law, and Louisiana law.

Plaintiffs' Complaint                                                Page **34** of **111**

87.    Joy also told Defendants that if any Louisiana lawyer found the economics or responsibilities unattractive, the proper and only ethical course of action was to withdraw and allow JJJ to handle the cases internally, as originally planned, or with alternate local counsel in Louisiana. What was *not* proper was to hold clients and money hostage while demanding a larger cut.

88.    Joy further stressed that, under no circumstances should any self-serving acts or omissions by an attorney ever cause prejudice to a represented client. Here, Defendants' wrongful conduct has unquestionably caused JJJ's clients to suffer additional, wholly unnecessary and avoidable harm, as described further herein.

89.    When Joy—the overall lead attorney on the project, by virtue of the *clients*' decisions—refused to bend any further and give Defendants an unearned, undeserved 30% cut of JJJ's fee interest, Defendants refused to take no for an answer. And this time they did not seek to amicably resolve their dispute over dinners. Rather, from August 2024 onwards, they proceeded to start 'breaking things.'

90.    **First, Defendants turned their focus to Xpand Legal**, LLC, a litigation consulting and support vendor closely allied to JJJ and JJJ clients in their various litigation efforts, baselessly accusing Xpand of fraud. Xpand's team of paralegals and legal professionals provided support during the JJJ-SLF Joint

Plaintiffs' Complaint                                                      Page **35** of **111**

Venture, including collecting and processing signed CFAs, conducting file audits, and administering case management software.

91.     Xpand was indispensable to the JJJ-SLF Joint Venture because they were preparing to take on nearly 1,000 former MMA clients and SLF did not have the infrastructure or resources to manage that caseload. Without professional support services to handle intake, client communications, and case administration, the venture could not have functioned. As Tiffany Paul, Xpand's owner, later wrote to Defendants: "Without Xpand, you would have been in trouble with 1000 cases. It would have been MMA 2.0."

92.     On or about June 30, 2023, Sangisetty negotiated a contract with Xpand, including the hourly rates and scope of services. Because of JJJ's involvement—and Xpand's prior history with and trust in the JJJ firm—Xpand agreed to fully deferred payment terms. From the outset of the project through August 2024, Xpand provided services, with over a dozen professionals on Xpand's payroll devoting significant time to the JJJ-SLF project, on the reasonable expectation it would be compensated from case recoveries.

93.     Under the terms of the CFA, clients pay all costs, including the costs of Xpand Legal's services.

94.     On November 14, 2023, Xpand sent Joy its billing statement for August, September, and October 2023, totaling $378,668.90. Joy shared the invoice with Sangisetty. He raised no allegation of fraud.

95.    Under the contract with Xpand, SLF had two affirmative duties: (1) to notify Xpand each time JJJ-SLF settlement funds were received on an ex-MMA case, and (2) to deduct from each settlement a line-item expense to compensate Xpand for services rendered.

96.    SLF did not notify Xpand when settlements were received. And SLF refused Joy's repeated requests for access to client settlements and financial records related to JJJ-SLF cases—even though Sangisetty acknowledged that Joy was entitled to this information. Joy later learned that Sangisetty never attempted to ascertain or deduct the specific charges owed to Xpand from client recoveries, despite Joy having provided Sangisetty a template disbursement agreement for that exact purpose. Had Sangisetty provided Joy with access to basic joint venture financial data, Joy could have discovered these breaches sooner. And had Sangisetty notified Xpand each time settlement funds were received, the billing dispute Defendants later manufactured would have been avoided entirely because Sangisetty would have known the very information he later claimed was a surprise.

97.    When Joy finally learned and appreciated his partner had deliberately failed to honor the arrangement with Xpand, he was understandably alarmed: "[W]hy on God's Green Earth have 100s of disbursements been issued without an expense for Xpand?"

98. The answer is clear: Defendants cut off Joy's access to the cases' settlement and disbursement communications, as well as material bank records, thereby permitting Defendants to alienate Xpand, Joy's long-term ally. To cure Defendants' exclusionary tactic, Joy promptly demanded he be included on all settlement and disbursement communications and that all material banks records be shared.

99. But Defendants pressed on with their fictitious claims of Xpand's purported fraud, with Magee demanding Xpand's invoices and Coussan declaring "xpand is closed out as far as I am concerned."  Upon receipt of Xpand's bill on July 31st, Coussan texted: "criminal fraud. 740k. Fbi worthy." Magee called the billing "fictitious bordering on fraudulent." Yet just months earlier, Sangisetty had reviewed a $378,668.90 invoice (a portion of the ultimate $740,000 billed by Xpand) covering only three months and raised no concern about fraud or scope.

100. In reality, Defendants' targeting Xpand was motivated by their scheme to reap the benefits of the risks and effort of others, not actual fraud. Defendants also knew that their attack on Xpand would have consequences beyond the ex-MMA docket. Joy had told Sangisetty that Xpand was supporting approximately 4,000 other JJJ matters on deferred terms across unrelated dockets. Defendants knew that JJJ was Xpand's biggest single client. By eliminating Xpand's involvement in the litigation, Defendants aimed to marginalize JJJ, thereby forcing JJJ to cave to Defendants' demands.

101.   On August 13, 2024, without consulting Joy, SLF filed suit against Xpand in Terrebonne Parish—but delayed service and kept the lawsuit secret from Joy. Defendants did not inform Joy of the suit. When Joy learned of the suit more than two months later, he sought to negotiate a resolution.

102.   The filing of the lawsuit without JJJ's knowledge, the delayed service, and the refusal to negotiate made clear it was not intended to vindicate a legitimate claim but to serve as a coercive weapon.

103.   **Second, Defendants began secreting away case information.** Throughout the first half of 2024, JJJ repeatedly requested access to settlement data, status information, disbursement records, and reimbursement information that should have been stored in the joint repository. JJJ also offered to assume settlement administration if SLF could not perform it competently. Instead, Defendants cut JJJ's access to the shared settlement-tracking spreadsheet. They abandoned the SmartAdvocate system that JJJ had paid nearly $26,000 to implement. They stopped copying JJJ on settlement communications. They refused to provide settlement statements and accounting records. Rather than operating as co-counsel on a joint docket, they acted as though JJJ had no right to see the status of its own clients' cases or the money being generated from them.

104.   On June 28, 2024, JJJ paralegal Bree Miller sent a request to be copied on settlement-related communications "so we can see how mediations are going in real time, what has settled, what hasn't and to see any copies of releases."

Coussan dismissed the request, stating that "real time updates" were "neither feasible nor necessary" and that "I don't have time for more emails or requests for emails." Joy responded that every settlement disbursement had to be reviewed and approved by Joy and Sangisetty before being sent to clients, as required by the JJJ-SLF Agreement, the CFAs, and their professional obligation as lawyers and co-counsel of record.

105.   In August 2024, Joy wrote to Sangisetty that "[SmartAdvocate] is now more or less useless for the purposes for which it was originally acquired, and my firm does not have access to whatever alternative system SLF is using to manage the nearly 1,000 ex-MMA cases we jointly represent." Sangisetty's response, in its entirety: "This is classic backseat driving." Defendants did not give JJJ access to the alternative system.

106. This information blockade was not a mere management disagreement. It was a necessary step in Defendants' effort to acquire practical control over the ex-MMA docket and the money associated with it. By cutting JJJ off from the case data, settlement pipeline, and disbursement process, Defendants positioned themselves to unilaterally collect and disburse funds, to control client communications, and to exclude JJJ from the economic fruits of the risk and effort borne by JJJ.

107.   **Third, Defendants cut JJJ out of communications with clients and opposing counsel.** On September 16, 2024, the Defendants' objective was stated openly in a group text exchange. After JJJ's office sent routine

correspondence to opposing counsel to ensure JJJ's inclusion on settlement checks, Magee opened the exchange by texting Joy: "Jason, are you fucking stupid?" He then complained that JJJ was sending letters to opposing counsel "trying to get your hands on the check" and told Joy to "please stop injecting yourself into this."

108. When Joy responded that Magee was not on the retainer agreements and asked for the supposed association agreement under which Magee claimed authority, none was produced.

109. Sangisetty's contribution to the same exchange was equally revealing. He texted Joy: "you need to tell your office to stop sending emails to opposing counsel now," and then: "We are well past trying to incorporate you back into the work. Let us finish the work and stop interfering."

110. Those statements captured the scheme in plain language. JJJ had originated the project and the clients, created the infrastructure, funded the docket, signed the client contracts, and remained jointly responsible for the representation. Yet Defendants were now telling Joy to stop "interfering" while they finished "the work" and controlled the money.

111. **Fourth, Defendants interfered with JJJ's client relationships.** As the exclusion deepened, JJJ began receiving a series of strikingly similar client complaints. Clients reported that SLF personnel contacted them shortly before mediations or settlement events, were unfamiliar with the facts of the case,

pushed low-value settlement positions, and—when clients asked to speak with Joy or said they trusted JJJ—responded that JJJ "cannot represent" them because JJJ is a Texas firm not licensed in Louisiana.

112. For these clients—hurricane survivors who had already endured MMA's betrayal—being told that their chosen attorney "cannot represent" them was not merely a legal technicality; it was a second abandonment engineered by Defendants.

113. JJJ had written fee agreements with those clients. JJJ remained jointly responsible for the representation. JJJ worked with Louisiana-licensed counsel. The venture itself had been structured to comply with the need for Louisiana coverage. Yet clients were repeatedly told that the lawyer and firm they had actually retained lacked authority to represent them. Those statements were knowingly false and were made to alienate clients from JJJ, suppress JJJ's oversight, and cement Defendants' control over the files and settlements.

114. **Fifth, Defendants seized absolute control over the entire docket.** On February 12, 2025, SLF unilaterally revoked JJJ's already severely limited access to client files and case data. Defendants now had total control over the files, client communications, settlement process, and most importantly to them, the flow of money, without any oversight or involvement by JJJ.

115. Defendants used that control to omit JJJ's fee interests from settlement disbursement statements and related closing documents, just as they

had omitted Xpand's cost disbursements. Clients were presented with paperwork reflecting no JJJ fee share, enabling SLF to collect the full contingency fee or hold the full disputed amount while the clients were not informed that JJJ remained contractually entitled to a portion.

116.   Beginning February 12, 2025 SLF unilaterally revoked JJJ's access to shared client files, calendars, settlement data, and related information. In the following two months—through April 18, 2025—JJJ made no fewer than twenty formal requests to restore that access. Every request was either ignored or refused without explanation. The sole substantive response came on March 11, 2025, from Magee, who dismissed the requests for further information by asking that such requests stop and that they would "consider [the] request ongoing." Magee's response confirmed that the exclusion was deliberate and continuing, and that SLF had no intention of restoring JJJ's access to the jointly maintained files.

117.   In February 2025, SLF filed a lawsuit against JJJ and certain of its lawyers in Terrebonne Parish. They fraudulently joined a non-diverse defendant in a failed attempt to destroy complete diversity and prevent removal. This was an objectively baseless lawsuit brought for an improper purpose, running the same playbook as they had with Xpand, designed to coerce JJJ while Defendants retained control over the underlying docket and funds. Sangisetty's (and Defendants') decision to use his firm to file this lawsuit in the Terrebonne Parish was no mistake: in their words, Defendants "own" the courts in that parish.

118. In May 2025, Coussan made a final demand. He proposed what he called a "buyout," asking for "several hundred thousand dollars," using as leverage the facts that Defendants were in control of the clients and continued to wrongfully withhold all funds owed to JJJ. Joy declined.

119. On May 14, 2025, JJJ sent a formal demand asserting JJJ's 50% fee and cost lien, demanding full and complete access to all case and client-specific information, and requesting a full accounting. Through counsel, Sangisetty responded on May 29, 2025 that approximately $825,000 in disputed hurricane-case funds was being held in SLF's IOLTA account. JJJ's contractual fee share and advanced costs are secured in part by those funds, which Defendants continue to withhold while denying wrongdoing and refusing payment.

120. Defendants have likewise wrongfully withheld or interfered with the Holdback that Sangisetty negotiated on behalf of Joy while acting as Joy's attorney, even though that holdback was part of the economic structure that made the former MMA rescue project possible in the first place.

121. By the time of the lockout, the object of the scheme was clear. JJJ had originated and financed a large docket of cases. It had signed the clients, built the systems, advanced the money, and performed substantial legal and supervisory work. Defendants then sought to convert that operational control into legal and economic control so that they could force JJJ either to surrender part of its

interests or to litigate for access to money and files that should never have been withheld in the first place.

## The Client Playbook

122. The acts described below played out in the same pattern: an SLF lawyer or staff member would contact a jointly represented client shortly before a key event, display little familiarity with the file, push a low-value resolution, and—when the client asked to involve JJJ—tell the client that JJJ "cannot represent" them because JJJ is a Texas firm. These communications were knowingly false and were made to isolate JJJ from the clients it had originated and represented, to suppress JJJ's oversight, and to permit Defendants to control settlements and fees without interference. Below are four (among many) examples of Defendants applying that playbook (client names redacted).

### A.    Client A

123. In September 2024, Client A contacted Joy after speaking with Boyles (SLF) concerning Client A's upcoming mediation. Boyles asked Client A the least amount of money he would accept to settle the case, appeared unfamiliar with basic facts concerning the claim, and could not answer simple questions about value. When Client A stated he wanted to speak with Joy, Boyles told Client A that Joy was too busy and that JJJ could not represent Client A because JJJ was a Texas firm and not licensed in Louisiana. The statement was false, because Client A had retained both JJJ and SLF under a written agreement.

Plaintiffs' Complaint                                            Page **45** of **111**

124.   At a November 21, 2024 mediation, Boyles appeared unprepared, lacked updated damages support, and pressed Client A to accept a $15,000 offer. Client A refused. Boyles berated Client A for not taking the offer. SLF then moved ex parte to withdraw from Client A's case. The matter later resolved without Boyles or SLF's involvement for approximately $50,000 pursuant to a mediator's proposal accepted in 2026.

### B.   Client B

125.   Client B retained JJJ and SLF on November 6, 2023 in connection with a Hurricane Laura claim for residential and farm-related losses. The claim included a farm policy and losses extending beyond a standard dwelling claim. JJJ assessed the matter as having substantially higher value than the resolution SLF later attempted to secure.

126.   On August 6, 2024, Magee conducted mediation on Client B's claim without notifying JJJ. Magee pressed Client B toward a $45,000 settlement, which represented only one component of the available coverage and did not adequately account for the full range of losses. When Client B resisted, she was told she might end up with nothing if she did not settle.

127.   When Client B sought to involve Joy and JJJ, Boyles and Sangisetty told them that JJJ "cannot represent" them because JJJ is not licensed in Louisiana. The statement was false.

Plaintiffs' Complaint                                                   Page **46** of **111**

128.   On January 8, 2025, Boyles emailed Client B warning of attorneys' fees if he did not sign the release. On February 10, 2025, Boyles emailed Client B that the advice Joy had given "was not good advice and could cost you money in the very near future." Both emails were copied to Sangisetty and Magee.

129.   The original settlement check resulting from the settlement that Defendants coerced Client B to sign was issued to SLF alone, with no provision for JJJ's fee interest. SLF did not disclose to JJJ that settlement had occurred.

### C.   Client C (through Client C-Rep)

130.   Client C retained JJJ and SLF in November 2023 in connection with storm damage to his home. Joy was the lawyer who had taken the time to discuss the claim.

131.   In January 2025, Client C-Rep—acting as Client C's caretaker and attorney-in-fact—contacted Joy after a call with Boyles. According to Client C-Rep, Boyles asked what the least amount the client would take to settle, then suggested that "$2,000" was effectively the best the case could produce despite losses that substantially exceeded that figure. When Client C-Rep stated that JJJ was Client C's lawyer, Boyles told her that JJJ "cannot represent" Client C because JJJ is not licensed in Louisiana. That statement was false.

132.   JJJ intervened at Client C-Rep's request. As a result, the case resolved for $22,500—more than eleven times the figure Boyles had represented as the likely ceiling of the claim.

Plaintiffs' Complaint

### D.    Client D

133.    Client D retained JJJ and SLF on September 27, 2023, in connection with a Hurricane Laura and Hurricane Delta claim against State Farm. An independent adjusting estimate reflected losses far in excess of the $35,000 offer later presented at mediation.

134.    On or about August 6, 2024, SLF attended mediation on Client D's claim without notifying JJJ. The mediation ended without settlement after State Farm offered $35,000.

135.    When Client D later sought to communicate with Joy and JJJ about the claim, Sangisetty texted Joy on November 8, 2024: "Please stop calling Client D—please—apparently yall pissed her off, she's been very sick, please direct all correspondence thru me." On November 12, 2024, Sangisetty again texted: "Last time — stop calling Client D."

136.    Then, on November 20, 2024, Boyles emailed JJJ and stated that Client D "refuses to answer my calls," accused JJJ of "breathing poison in Client D's ear," asserted that JJJ "can't help her out as nobody in the firm is licensed in Louisiana," and directed JJJ to "refrain from speaking with clients while we are trying to resolve these cases."

### E.    The Reissued-Check Matters

137.    Defendants' fee practices extended beyond client interference to outright fee capture in matters that required little or no legal work.

138.    In at least seventeen former MMA cases, settlement checks had already been issued before MMA's March 2023 suspension and were later cancelled. According to Plaintiffs, the only step required after suspension was to request that the insurers reissue the checks. SLF performed that administrative task and then collected the full contingency fee in those matters, totaling approximately $43,706, even though the meaningful legal work associated with obtaining the settlements had already been done.

139.    In one example, MMA had already settled the claim for $40,000 before its suspension. SLF's only role was to request reissuance of the check, yet SLF collected approximately $10,000 in attorney's fees while JJJ received nothing.

140.    These reissued-check matters demonstrate that Defendants' objective was not the fair allocation of fees according to work, contract, or client agreement. Their objective was control over the payment stream associated with the ex-MMA docket.

## RICO ALLEGATIONS

### The Association-in-Fact Enterprise

141.    At all times relevant to this action, Defendants, non-defendant SLF, and associated persons whose conduct furthered the objectives of the scheme constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962

142.   In particular, the Enterprise has a common goal of inducing Plaintiffs to invest hundreds of thousands of dollars in developing a litigation portfolio, the interests in which, once valuable, Defendants would coerce Plaintiffs into surrendering. As described above and further specified below, Defendants employed numerous fraudulent and coercive tactics aimed at accomplishing this end.

143.   The members of the Enterprise have a long-standing and ongoing relationship rooted in a mutual interest and participation in common criminal activities.

144.   The Enterprise operates as a continuing unit with its members operating under a division of roles:

a.    Coussan acts as architect, confidence man, and pressure source. He introduced Joy to the arrangement he assembled, discouraged alternative Louisiana structures, has exploited his position, influence, and family relationship to press Joy to remain within the arrangement he had assembled, and has demanded a share of JJJ's interests.

b.    Sangisetty acts as the operational hinge. He first obtained confidential information as Joy's attorney, then became JJJ's nominal co-counsel partner through SLF, and later participated in excluding JJJ from files, settlements, and disbursement information while retaining or withholding the money generated by the docket.

Sangisetty continues to exclude Joy from his financial, security, and proprietary interests.

c.   Magee acts as a pressure and enforcement agent. He has asserted authority over matters in which he lacked authority or interest, joined demands that Joy surrender portions of JJJ's interests, and excluded JJJ from communications with opposing counsel, clients, and settlement processes.  He also has leveraged his purportedly substantial connections and influence in an attempt to intimidate Joy into folding under the weight of Defendants' pressure campaign.

d.   Boyles serves as the principal client-facing actor for "cannot represent" communications and pressure-to-settle communications.

e.   Olmsted, B. Long, Correa, M. Long, and Comeaux each carry out operational, settlement-related, and file-related conduct in furtherance of the Enterprise's objectives. Plaintiffs submit that discovery that these persons knowingly and actively conducted the Enterprise.

f.   Landry Magee and ABLC provide organizational vehicles through which Magee- and Coussan-related participation, authority claims, and benefits could be asserted or routed.

145.  The Enterprise was distinct from each individual defendant sued as a RICO person. No single defendant alone constituted the Enterprise; the

Enterprise was the association-in-fact through which defendants and SLF coordinated their activities.

146. The Enterprise has longevity sufficient to permit Defendants to pursue the Enterprise's goal of defrauding Plaintiffs to Defendants' profit. Its members acted repeatedly over an extended period of time. The scheme at the heart of the Enterprise commenced and has been in operation since at least June 2023.

## Means and Methods of the Enterprise

147. The conduct alleged above constituted a coordinated scheme to obtain control of the ex-MMA docket, pressure clients into low-value settlements, and divert the money associated with the docket. The acts in furtherance of the scheme included, without limitation, the following:

148. **Inserted themselves into the rescue project.** On Coussan's recommendation, Joy retained Sangisetty in June 2023 to negotiate and draft the secondment agreement with MMA. In that engagement, Sangisetty obtained confidential information regarding the economics of the rescue, JJJ's strategic plans, and the docket's projected aggregate value. Sangisetty was the point of access into the project for Coussan, Magee, and their respective firms.

149. **Misrepresented Louisiana law on fee sharing.** On June 28, 2023, before any client had been signed, Sangisetty texted Joy that the firms "can't explicitly share fees in Louisiana pursuant to a JV since it's not a class action"

and reinforced that position in calls on June 29 and July 2, 2023. The representation was false. It induced Joy to enter the Joint Venture Agreement without a written fee allocation and laid the groundwork for later claims that JJJ's contractual fee interests were uncertain.

150. **Failed to deliver the judicial approval that justified Sangisetty's involvement.** Sangisetty represented that he could obtain judicial approval for MMA-to-JJJ file transfers in time for the Hurricane Ida limitations deadline. He could not, and he did not. At the time of making the subject statement, Sangisetty also knew that he could not deliver on the subject promise but, instead, used it as a way to hook Joy into Defendants' scheme. JJJ was forced to pivot to a direct-solicitation model and to fund the resulting infrastructure entirely on its own.

151. **Threatened Joy not to retain alternative Louisiana counsel.** On August 21–22, 2023, Coussan urged Joy to "stay the course" and to "let our first group handle them," warning that if Joy retained other Louisiana counsel, his "name will be spread around negatively." Coussan was at that time a Louisiana state legislator. Joy understood the warning as a threat to his ability to practice in Louisiana or, worse, to his reputation more generally.

152. **Pressured Joy to surrender JJJ's contractual fee interest.** On December 26, 2023, Coussan demanded that Joy transfer 20% of JJJ's attorney's fee interest to Coussan. On January 23, 2024, Sangisetty, Coussan, and Magee traveled to Houston and pressed Joy in person. In July 2024, Magee emailed Joy

that the "current situation" was "unsustainable" and demanded a renegotiation of the Joy-Sangisetty fee division. In May 2025, Coussan demanded "several hundred thousand dollars" as a "buyout" of claims he had no contractual basis to assert.

153. **Manufactured a pretextual dispute with Xpand Legal.** After consuming approximately twelve months of Xpand Legal's litigation-support services in building and operating the docket, defendants in August 2024 began accusing Xpand of fraud and overbilling. The lawsuit was objectively baseless and brought for the subjective purpose of isolating JJJ from the operational support that had enabled JJJ to manage the docket.

154. **Cut JJJ off from the case-management system JJJ had funded.** By August 2024, defendants had abandoned the SmartAdvocate platform that JJJ had purchased, configured, and paid to license, in favor of a separate system to which JJJ was not given access. Joy's August 2024 written objection that SmartAdvocate was "more or less useless" without parallel access drew Sangisetty's response: "This is classic backseat driving."

155. **Cut JJJ off from settlement and disbursement information.** Defendants stopped copying JJJ on settlement communications, refused to provide settlement statements and accounting records, and dismissed JJJ paralegal Bree Miller's June 28, 2024 request for routine settlement updates as "neither feasible nor necessary."

156. **Falsely told jointly represented clients that JJJ "cannot represent" them.** In communications with Client A (September 2024), Client B (August 2024), Client C-Rep acting for Client C (January 2025), and Client D (November 2024), Boyles—and at times Sangisetty and Magee—stated that JJJ "cannot represent" the client because JJJ is a Texas firm. Each statement was false: each client had retained both JJJ and SLF under written CFAs that named JJJ as joint counsel, and JJJ worked with Louisiana-licensed counsel as needed.

157. **Pressed clients toward low-value settlements while suppressing JJJ's involvement.** In the Client A matter, Boyles pressed a $15,000 mediated settlement; the matter ultimately resolved for approximately $50,000 after JJJ's intervention. In the Client C matter, Boyles characterized $2,000 as effectively the ceiling on a claim that resolved for $22,500 after JJJ took over preparation and mediation. In the Client B matter, SLF mediated to $45,000 without notifying JJJ, and Boyles thereafter warned the clients that JJJ's advice "could cost you money in the very near future."

158. **Cut JJJ out of communications with clients and opposing counsel.** In the September 16, 2024 group text, Magee told Joy: "please stop injecting yourself into this" (i.e., Joy's own cases and clients). Sangisetty added: "We are well past trying to incorporate you back into the work. Let us finish the work and stop interfering." Sangisetty texted Joy on November 8 and 12, 2024 directing him to stop calling Client D. On November 20, 2024, Boyles emailed JJJ

directing it to "refrain from speaking with clients while we are trying to resolve these cases."

159. **Issued settlement checks to themselves.** In the Client B matter, the original settlement check was issued to SLF alone, with no provision for JJJ's contractual fee share and no disclosure to JJJ that the settlement had occurred. JJJ intervened and demanded that the check be reissued. In at least seventeen reissued-check matters totaling approximately $43,706 in fees collected, SLF performed only the administrative task of requesting check reissuance after MMA's suspension and retained the entire contingency fee, paying JJJ nothing.

160. **Locked JJJ out of the files.** On February 12, 2025, SLF unilaterally revoked JJJ's access to all client files and case data. Between February 12 and April 18, 2025, JJJ requested reinstatement of access at least twenty times. The requests were ignored or refused, and the exclusion remains ongoing.

161. **Refused to release funds to JJJ.** On May 14, 2025, JJJ sent a formal demand for full access to client and settlement information and an accounting. On May 29, 2025, SLF's counsel confirmed in writing that approximately $825,000 in disputed hurricane-case funds was being held in SLF's IOLTA account. Defendants have not released those funds, have not provided an accounting, and have not released JJJ's interest in the Holdback.

162.   **Used litigation as a coercive tool.** In addition to the August 13, 2024 Xpand suit, in March 2025 SLF filed a lawsuit against JJJ and certain of its lawyers in Terrebonne Parish, fraudulently joining a non-diverse Louisiana lawyer to destroy complete diversity and prevent removal. The suit was filed not to vindicate a legitimate claim but as a coercive instrument to pressure JJJ while defendants retained control over the underlying docket and funds. The cited filings were objectively baseless and were brought for the improper purpose of impeding JJJ's recovery of its contractual interests.

## Pattern of Racketeering Activity

163.   Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity that included multiple acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), federal law extortion (18 U.S.C. § 1951), state-law extortion (*see* Tex. Penal Code § 31.03) as a state-law predicate under 18 U.S.C. § 1961(1)(A).

164.   The predicate acts included, among other things:

a.    interstate text messages, emails, and other wire communications designed to induce Joy to proceed under structures favorable to Defendants, surrender portions of JJJ's fee interests, or cease asserting JJJ's contractual rights;

b.    interstate wire communications falsely representing to jointly represented clients that JJJ could not represent them because JJJ is a Texas firm;

c. interstate communications and settlement-related transmissions designed to exclude JJJ from settlement negotiations, check issuance, disbursement review, and related financial information;

d. mailed and wired settlement and disbursement materials that omitted or concealed JJJ's contractual fee interests;

e. coercive demands and threats intended to force Joy and JJJ to relinquish or compromise their interests in the ex-MMA docket and associated funds; and

f. additional predicate conduct described in the factual allegations above and to be further proven through discovery.

165. Each act was directed in whole or in substantial part at JJJ and was committed in furtherance of the common scheme. By way of example:

a. June 28, 2023 Sangisetty text to Joy stating that the firms "can't explicitly share fees in Louisiana"—a knowing misrepresentation of Louisiana law transmitted by interstate wire to induce Joy to enter the Joint Venture Agreement without a written fee division.

b. August 21–22, 2023 Coussan texts to Joy warning that if Joy retained alternative Louisiana counsel his "name will be spread around negatively"—an extortionate communication transmitted by interstate wire and intended to obtain property by threat.

c.   December 26, 2023 Coussan demand for 20% of JJJ's attorney's fee interest, transmitted by interstate wire—an attempt to obtain property by extortionate means.

d.   January 23, 2024 in-person demand by Sangisetty, Coussan, and Magee in Houston that Joy surrender a substantial portion of JJJ's contractual fee interest, facilitated by interstate travel and supported by interstate wire communications.

e.   July 2024 Magee email demanding renegotiation of the Joy-Sangisetty fee division—transmitted by interstate wire as part of the extortion.

f.   August 2024 Magee harassing communications to Tiffany Paul of Xpand Legal—transmitted by interstate wire as part of the pretextual attack on JJJ's operational support.

g.   August 13, 2024 SLF lawsuit against Xpand Legal in Terrebonne Parish, held for service over two months—a sham litigation act in furtherance of the scheme.

h.   September 16, 2024 group text from Magee and Sangisetty directing Joy to "stop injecting yourself" and to "stop interfering"—transmitted by interstate wire as part of the exclusion campaign.

i.   November 8 and 12, 2024 Sangisetty texts directing Joy to stop calling Client D—transmitted by interstate wire to suppress client contact.

Plaintiffs' Complaint

j.  November 20, 2024 Boyles email to JJJ accusing it of "breathing poison" in Client D's ear and falsely asserting that JJJ "can't help her out" because JJJ is not licensed in Louisiana—wire fraud as to Client D and JJJ.

k.  September 2024 communications by Boyles to Client A falsely stating that JJJ could not represent him because JJJ is a Texas firm—wire fraud.

l.  August 2024 communications by Boyles and Sangisetty to Client B falsely stating that JJJ could not represent them—wire fraud.

m.  January 2025 communications by Boyles to Client C-Rep falsely stating that JJJ could not represent Client C—wire fraud.

n.  January 8 and February 10, 2025 Boyles emails to Client B falsely characterizing Joy's advice and pressuring acceptance of an under-value settlement—wire fraud transmitted by interstate wire and copied to Sangisetty and Magee.

o.  Settlement-check issuance and disbursement-statement omissions in the Client B matter and approximately seventeen reissued-check matters totaling approximately $43,706 in fees collected, distributed by wire and mail without disclosure of JJJ's contractual fee interest—mail and wire fraud.

p.    February 12, 2025 lockout of JJJ from the files and the subsequent refusal to restore access—a continuing scheme element executed and maintained through interstate wire communications.

q.    March 11, 2025 Magee email confirming the exclusion was "ongoing"—wire communication in furtherance of the scheme.

r.    March 2025 SLF lawsuit against JJJ in Terrebonne Parish—a sham litigation act used as a coercive instrument.

s.    May 2025 Coussan "buyout" demand of "several hundred thousand dollars"—wire communication in furtherance of the extortion.

t.    Continuing wrongful withholding, as of the filing of this complaint, of approximately $825,000 in IOLTA-held funds and the Holdback— mail and wire fraud and continuing extortion.

166.    Taken together, these matters show a recurring pattern. Defendants repeatedly used the same methods across different client files: restricting JJJ's access to case information; contacting clients shortly before key events; pressing low-value settlements without adequate preparation; telling clients that JJJ "cannot represent" them; excluding JJJ from settlement and disbursement activity; and positioning SLF or associated actors to capture or withhold the money generated by the docket JJJ had built.

167.    Each predicate act was related to the others. The acts had the same purpose (control over the docket and its money), involved overlapping participants (Sangisetty, Coussan, Magee, Boyles, and SLF, ABLC, and Landry Magee

personnel), targeted the same property (JJJ's fee interests, advanced costs, the Holdback, and funds held in trust), and were carried out through the same methods (misrepresentation, pressure, exclusion, and concealment)

168.  The predicate acts extended over, at minimum, twenty-three months from June 2023 to May 2025 and were directed at numerous specific matters and persons. The duration, breadth, and number of acts satisfy the closed-ended continuity standard. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241–43 (1989).

169.  The scheme also continues. Defendants continue to withhold approximately $825,000 in disputed IOLTA funds, continue to refuse access to client files, continue to exclude Plaintiffs from the representations, and continue to bring sham litigation. Absent intervention, the conduct will continue. The pattern thus also satisfies open-ended continuity

## HARM TO PLAINTIFFS

170.  As a direct and proximate result of defendants' conduct, plaintiffs have suffered injury to business and property, including: (a) loss, diversion, or withholding of JJJ's contractual 50% fee interests in jointly represented matters; (b) loss, diversion, or withholding of approximately $300,000 in reimbursable costs and expenses advanced by JJJ; (c) impairment, diversion, or wrongful withholding of money associated with the Holdback; (d) impairment of JJJ's security interest in approximately $825,000 in identifiable hurricane-case funds presently held in SLF's IOLTA account; (e) loss of the economic value of and control over the ex-

MMA docket; (f) additional operational and litigation costs incurred to reconstruct file access, protect clients, intervene in pending matters, and recover JJJ's rights; and (g) reputational damage to JJJ (individually and collectively) among the jointly represented clients and within the Louisiana plaintiffs' bar.

## PROXIMATE CAUSE

171. Defendants' pattern of racketeering activity proximately caused plaintiffs' injury. The "cannot represent" wire-fraud predicates aimed at clients directly caused settlement-related harm to JJJ's contractual fee interests by inducing clients to exclude JJJ from the representation and from settlement processes. The wire-fraud predicates aimed at Joy—Sangisetty's false representations regarding fee-sharing restrictions and Coussan's misrepresentations about his and Magee's roles—directly caused JJJ to advance more than $300,000 in capital and forgo alternative counsel arrangements. The extortionate demands directly caused JJJ to incur litigation costs to recover its rights. The settlement-disbursement omissions directly caused loss of contractual fee shares.

172. Plaintiffs' injury was concrete, not derivative or remote.

## COUNT ONE

### VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants as Applicable)

173. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

174.  Section 1962(c) makes it unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

175.  At all relevant times, Plaintiffs were and are each a person within the meaning of 18 U.S.C. § 1961(3) and 1962(c).

176.  At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).

177.  At all relevant times, each Defendant was, and is, a person that exists separate and distinct from the RICO enterprise, as described herein.

178.  Sangisetty, Coussan, Magee, Boyles, Olmsted, B. Long, Correa, M. Long, and Comeaux are distinct persons, each with his or her own independent existence and functions.

179.  Landry Magee, LLC, on the one hand, and ABLC, on the other hand, are distinct entities, each with their own independent existence and functions. Landry Magee, LLC is organized under the laws of Louisiana and does business in Louisiana. It holds itself out as a law firm. ABLC is organized under the laws of Louisiana and does business in Louisiana. It holds itself out as a law firm.

180.  Defendants, Correa, and Comeaux constitute an associated-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4) as further described in Paragraphs 122–126. These persons are a group associated in fact for

the common purpose of carrying on an ongoing criminal enterprise. In particular, the Enterprise has a common goal of inducing Plaintiffs to invest hundreds of thousands of dollars in developing a litigation portfolio. Once valuable, the Enterprise would coerce Plaintiffs to surrender the portfolio and would exclude Plaintiffs from accessing the portfolio. As described throughout this complaint, the Enterprise employed numerous fraudulent and coercive tactics aimed at accomplishing this end.

181.    The Enterprise was engaged in, and its activities affected, interstate commerce, including through interstate communications, multistate legal representations, settlement and disbursement activity, banking transactions, data access, litigation conduct, and the movement of money and documents between Texas and Louisiana.

182.    Each Defendant, as well as Correa and Comeaux, being employed by or associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs. Defendants, Correa, and Comeaux did so by exercising discretionary authority, carrying out assigned roles, facilitating the common scheme, or otherwise participating in the operation or management of the Enterprise's activities.

183.    The Enterprise organized itself into a cohesive unit with specific assigned responsibilities and is structured to operate as a unit in order to accomplish the common goal and purposes of its fraudulent scheme, as stated in Paragraph 144.

Plaintiffs' Complaint                                        Page **65** of **111**

184.    Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity that included multiple acts of mail fraud, wire fraud, extortion, and other racketeering conduct within the meaning of 18 U.S.C. § 1961(1) as further described in Paragraphs 163–169. In particular, Defendants consistently and regularly committed multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, as well as multiple acts of extortion in violation of 18 U.S.C. § 1951 and Texas state law. Defendants engaged in this conduct for a period spanning at least from June 2023 through May 2025.

185.    These predicate acts were related to one another and formed a continuous pattern. They shared the same or similar purposes, involved overlapping participants, targeted the same property and economic interests, and were carried out through recurring methods of deception, pressure, exclusion, and concealment.

186.    Defendants' predicate acts were not isolated. They extended over a substantial period, were repeated across numerous client matters, and were part of an ongoing scheme to deprive JJJ of the benefit of the former MMA docket, its contractual fee interests, its advanced costs and expenses, and the economic rights associated with the Holdback.

187.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs suffered injury to their business and property as further described in Paragraph 170.

Plaintiffs' Complaint                                           Page **66** of **111**

188. Defendants' acts were both the but-for cause and the direct cause of Plaintiffs' injuries as further described in Paragraph 171.

189. By reason of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover all available relief under 18 U.S.C. § 1964(c), including treble damages, costs of suit, reasonable attorney's fees, and such other legal and equitable relief as the Court deems appropriate.

## COUNT TWO

### VIOLATION OF RICO, 18 U.S.C. § 1962(b)
**(Against Sangisetty, Coussan, and Magee in the Alternative)**

190. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

191. Section 1962(b) makes it unlawful for any person, through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, any interest in or control of an enterprise engaged in, or the activities of which affect, interstate commerce.

192. At all relevant times, the Enterprise described above was engaged in, and its activities affected, interstate commerce.

193. Through the pattern of racketeering activity alleged in Paragraphs 163–164, Sangisetty, Coussan, and Magee acquired and maintained interests in and control over the Enterprise, including and particularly the property, operations, and revenue streams administered through it.

194. These Defendants' objective was not merely to injure JJJ. It was to obtain and maintain practical and economic control over the ex-MMA storm docket that JJJ had originated, financed, and organized, and to use that control to dominate the settlement pipeline, disbursement process, client communications, fee stream, and holdback-related funds associated with the docket. Sangisetty, Coussan, and Magee leveraged their racketeering activity alleged throughout this complaint to acquire and maintain control of the Enterprise and its exclusionary operations in at least the following ways:

a. control over client files and case data;

b. control over the shared or replacement case-management systems;

c. control over the scheduling and conduct of mediations and settlement discussions;

d. control over communications with opposing counsel and jointly represented clients;

e. control over check issuance and settlement disbursement practices;

f. control over whether and how JJJ's contractual fee interests would be recognized;

g. control over whether JJJ would be given access to information necessary to supervise the cases; and

h. control over funds associated with the ex-MMA docket, including disputed fees, reimbursable costs and expenses, and money tied to the Holdback.

195. Sangisetty, Coussan, and Magee maintained that control by continuing the same pattern of racketeering activity after initial acquisition. Even after JJJ objected, demanded transparency, asserted its rights, and requested restoration of access, these Defendants persisted in the exclusion, withholding, concealment, and coercive conduct alleged herein. The February 2025 lockout and the continuing refusal to restore access or release money owed to JJJ were part of these Defendants' maintenance of control over the Enterprise, including and particularly its economic outputs.

196. Plaintiffs' injuries were caused not only by the predicate acts themselves but also by Sangisetty's, Coussan's, and Magee's acquisition and maintenance of control of the Enterprise through those acts. Once these Defendants developed, acquired, and maintained practical control over the Enterprise's operations and the ex-MMA docket's revenue-generating mechanisms, they were able to exclude JJJ from the cases it had originated, prevent JJJ from protecting its clients and contractual rights, and divert, capture, or withhold the money associated with the docket owed to and earned by JJJ.

197. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(b), Plaintiffs suffered injury to their business and property as further described in Paragraph 170.

198. Sangisetty's, Coussan's, and Magee's acquisition and maintenance of control were accomplished through the same pattern of fraud, concealment,

coercion, interference, and exclusion alleged throughout this Complaint. Those acts gave these Defendants the ability to control who could access the files, who communicated with the clients, who negotiated and documented settlements, who received checks, and whether JJJ would receive any part of the economic value of the docket it had created. Given such unfettered control, these Defendants could exclude JJJ from the above-noted activities.

199.   By reason of Defendants' violation of 18 U.S.C. § 1962(b), Plaintiffs are entitled to recover all available relief under 18 U.S.C. § 1964(c), including treble damages, costs of suit, reasonable attorney's fees, and such other legal and equitable relief as the Court deems appropriate.

## COUNT THREE

### VIOLATION OF RICO, 18 U.S.C. § 1962(a)
### (Against All Defendants as Applicable)

200.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

201.   Section 1962(a) makes it unlawful for any person who has received income derived, directly or indirectly, from a pattern of racketeering activity to use or invest, directly or indirectly, any part of that income, or the proceeds of that income, in the acquisition of any interest in, or the establishment or operation of, any enterprise engaged in, or the activities of which affect, interstate commerce.

202.   At all relevant times, the Enterprise described above was engaged in, and its activities affected, interstate commerce.

203. Through the pattern of racketeering activity alleged herein, Defendants received income and proceeds derived from racketeering activity, including but not limited to money obtained, retained, diverted, concealed, or withheld through fraudulent settlement practices, fraudulent or misleading client communications, wrongful exclusion of JJJ from fees and disbursements, coercive demands for JJJ's economic interests, and the exercise of racketeering-based control over the ex-MMA storm docket and related payment streams. Such money includes the approximately $75,000 cash directly advanced by Joy to Sangisetty on or around August 25, 2023 and September 27, 2023 for purposes of the litigation as well as the approximately $10 million in settlement proceeds (actual and potential).

204. Defendants then used and invested those racketeering proceeds, directly or indirectly, in the operation, continuation, and expansion of the Enterprise. Defendants did so by using money and control obtained through the racketeering scheme to:

a.  continue operating the former MMA docket outside JJJ's oversight;

b.  fund or sustain the infrastructure through which Defendants controlled files, settlements, and communications;

c.  finance or support additional efforts to exclude JJJ from client relationships and case administration;

d.  maintain leverage over disputed funds, including fee shares, cost reimbursements, and Holdback-related sums;

e. support litigation, threats, and pressure tactics used to preserve Defendants' control over the docket and its revenue streams; and

f. preserve and enhance Defendants' ability to generate additional income from the ex-MMA matters and related proceedings.

205. The use and investment of racketeering income was not incidental. It helped sustain the Enterprise's ongoing operations and enabled Defendants to continue excluding JJJ from the docket, client communications, case information, and settlement proceeds while keeping control of the funds generated by the matters JJJ had originated and financed

206. As a direct and proximate result of Defendants' use and investment of racketeering income in the operation of the Enterprise, Plaintiffs suffered injury to business and property as further described in Paragraph 170.

207. Defendants' use and investment of racketeering income allowed the Enterprise to continue operating against JJJ and to preserve the wrongful control and economic benefits Defendants had acquired through the underlying pattern of racketeering activity, all to the exclusion of JJJ.

208. By reason of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiffs are entitled to recover all available relief under 18 U.S.C. § 1964(c), including treble damages, costs of suit, reasonable attorney's fees, and such other legal and equitable relief as the Court deems appropriate.

## COUNT FOUR

### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants as Applicable)

209. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

210. Section 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962(a), (b), or (c).

211. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed, expressly or tacitly, to violate 18 U.S.C. §§ 1962(c), 1962(a), and 1962(b) as described above and in violation of 18 U.S.C. § 1962(d). Among other things, Defendants have conspired to conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity and to acquire, maintain, exploit, and preserve control over the ex-MMA storm docket, the associated fee streams, the reimbursable costs and expenses advanced by JJJ, the settlement-related funds generated by the docket, and the Holdback or related economic interests.

212. The conspiracy alleged herein was not a matter of parallel conduct or independent decision-making. By and through each of Defendants' close relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knows the nature of the Enterprise and each Defendant knows that the Enterprise extends beyond the individual Defendant's role. Through the same connections and coordination, each

Defendant knows that Defendants were engaged in a conspiracy to commit predicate acts, and that the predicate acts were part of a pattern of racketeering activity.

213. Defendants acted with a shared objective and through coordinated conduct. Their agreement is evidenced by, among other things:

a. Coussan's introduction of Joy to Sangisetty and Magee and his repeated insistence that Joy remain within the arrangement Coussan had assembled;

b. Sangisetty's transition from Joy's attorney in the MMA secondment to JJJ's supposed co-counsel partner and later adversary in the execution of the scheme;

c. repeated coordinated demands that Joy surrender portions of JJJ's contractual and economic interests to persons or firms not identified in the governing client agreements;

d. recurring and substantially similar communications to jointly represented clients falsely stating that JJJ could not represent them because JJJ is a Texas firm;

e. the coordinated abandonment of shared systems and the collective refusal to provide JJJ with case files, settlement information, disbursement records, and access necessary to supervise the jointly represented docket;

f. coordinated efforts to control opposing-counsel communications, mediation settings, settlements, disbursements, and payment streams while excluding JJJ;

g. the February 2025 lockout and the continuing refusal to restore JJJ's access or release funds owed to JJJ; and

h. related litigation conduct, threats, demands, and acts of concealment intended to preserve Defendants' control over the docket and associated money.

214. Each Defendant knew the general nature of the conspiracy, knew that the scheme depended on repeated acts of fraud, coercion, exclusion, and concealment, and agreed to facilitate the overall objective even if each Defendant did not personally commit every predicate act. In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of coordination among Defendants is particularly within the control of Defendants.

215. Each Defendant joined the conspiracy knowing that one or more members of the conspiracy would commit at least two predicate acts of racketeering activity in furtherance of the common scheme. Each Defendant intended to further or facilitate the unlawful objectives of the conspiracy by performing his, her, or its assigned role in conducting, managing, and operating the Enterprise's illicit affairs. Defendants committed overt acts in furtherance of the conspiracy, including but not limited to:

a. negotiating, structuring, and exploiting the relationships through which JJJ's ex-MMA docket was built and later targeted;

b. transmitting fraudulent or misleading wire communications to Joy, JJJ personnel, jointly represented clients, opposing counsel, and others;

c. making coercive demands for portions of JJJ's fee interests and related property rights;

d. restricting and ultimately terminating JJJ's access to files, calendars, case data, and settlement information;

e. transmitting or causing the transmission of settlement and disbursement materials that omitted or concealed JJJ's interests;

f. interfering with JJJ's client relationships by using the repeated "cannot represent" falsehood and related communications;

g. withholding money associated with JJJ's contractual fee share, reimbursable costs and expenses, and the Holdback; and

h. using litigation and related threats as tools to preserve the benefits of the scheme.

216. The participation and agreement of each of the Defendants was necessary to permit the commission of the subject pattern of racketeering activity.

217. As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c), Plaintiffs suffered injury to business and property as further described in Paragraph 170.

Plaintiffs' Complaint

218. By reason of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs are entitled to recover all available relief under 18 U.S.C. § 1964(c), including treble damages, costs of suit, reasonable attorney's fees, and such other legal and equitable relief as the Court deems appropriate.

## COUNT FIVE

### FRAUD
### (Against Defendants Sangisetty, Coussan, and Magee)

219. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

220. Defendants Sangisetty, Coussan, and Magee, as part of their common scheme, made multiple factual material misrepresentations and omissions to Joy and JJJ in connection with the formation, financing, structure, and operation of the ex-MMA rescue project and the JJJ-SLF venture.

221. At all relevant times, Sangisetty was in a position of trust with respect to Joy and JJJ. Sangisetty first acted as Joy's attorney in connection with the MMA secondment agreement and then acted as JJJ's co-counsel and joint-venture partner in the former MMA matters. Coussan and Magee likewise made material representations to Joy and JJJ concerning the nature of the venture, the legal framework governing it, their intended roles, and their intentions regarding JJJ's contractual and economic interests.

222. Among other things, Defendants made the following material misrepresentations and omissions:

a.   **Misrepresentations regarding Louisiana fee-sharing law and the need for an unwritten arrangement**. In June and July 2023, Sangisetty represented to Joy that the firms could not explicitly share fees in Louisiana under the contemplated joint-venture structure and that Louisiana law prevented a written specified division of contingency fees in the arrangement he proposed. Coussan reinforced that position. These statements were false when made and were intended to induce Joy to proceed under an arrangement that left room for later efforts to challenge or diminish JJJ's contractual fee rights.

b.   **Misrepresentations regarding Sangisetty's loyalty, good faith, and intentions**. Sangisetty represented, expressly or by necessary implication, that he would act loyally and in good faith toward Joy and JJJ, both as Joy's attorney in the secondment transaction and later as JJJ's co-counsel partner. Those representations were false when made and that Sangisetty was, in reality, positioning himself to exploit confidential information and the venture structure for his own benefit and for the benefit of Coussan, Magee, and related actors.

c.   **Misrepresentations regarding equal fee sharing and recognition of JJJ as SLF's sole partner in the project.** After the Ida deadline and in connection with Joy's decision to continue working with SLF, Sangisetty represented that SLF would recognize

JJJ as its sole partner on the ex-MMA project, honor the revised 50/50 structure, and refrain from involving or compensating others out of JJJ's side of the deal. These representations were false when made.

d. **Misrepresentations regarding reimbursement of JJJ's costs and expenses.** Defendants represented, expressly or by implication, that JJJ would be repaid or appropriately credited for the substantial sums it advanced to build and maintain the docket, including solicitation costs, software, support infrastructure, and other project expenses. Those representations were made to induce JJJ to keep funding the venture and were false when made.

e. **Misrepresentations regarding the Holdback.** Sangisetty negotiated the secondment structure under which JJJ would safeguard the Holdback and represented, expressly or by implication, that the holdback arrangement would be honored according to the deal he negotiated on JJJ's behalf. Those representations were false or were later dishonored in bad faith as part of the same fraudulent scheme.

f. **Misrepresentations regarding the role, authority, and legitimacy of Coussan and Magee in the project.** Defendants represented, expressly or by implication, that Coussan and Magee were acting in good faith to assist and protect the venture, when, in reality, they were positioning themselves to demand and extract

value from a docket in which they had no client-approved contractual role.

g. **Defendants Sangisetty, Coussan, and Magee also made material misrepresentations and omissions concerning Xpand Legal and the intention to honor the Xpand arrangement.** Defendants represented, expressly or by implication, that Xpand's services were legitimate project expenses and would be honored accordingly, while later manufacturing unsupported accusations and using those accusations as a pretext to refuse payment and to attack infrastructure that JJJ had funded for the benefit of the venture. These statements and omissions were made to induce continued reliance by JJJ while preserving Defendants' ability to disavow the expense once the docket had become valuable.

223. Defendants made these misrepresentations and omissions with knowledge of their falsity, or with reckless disregard for their truth, and with the intention that Joy and JJJ would rely and act in reliance on them.

224. Joy and JJJ did in fact rely on Defendants' representations and omissions. Among other things, that reliance caused JJJ to:

a. retain Sangisetty as counsel in the MMA secondment transaction;

b. disclose confidential and proprietary information regarding the former MMA docket and JJJ's plans for it;

c. enter into and continue the venture with SLF;

d. continue funding the docket-building and operational costs of the project;

e. continue signing and supervising former MMA matters under the JJJ-SLF structure rather than moving immediately to other Louisiana counsel or a different operating model; and

f. refrain, at key moments, from terminating the arrangement sooner and protecting JJJ's interests through other means.

225. That reliance was justified. Joy had been introduced to Sangisetty and Magee through Coussan, Joy's brother-in-law and a politically powerful Louisiana lawyer, during an urgent successor-counsel crisis involving nearly 1,000 vulnerable former MMA clients. Sangisetty also occupied a position of trust by virtue of his attorney-client relationship with Joy in the secondment transaction.

226. As a direct and proximate result of Defendants' fraud, Plaintiffs suffered substantial injury, including but not limited to:

a. loss, diversion, or withholding of JJJ's contractual fee interests;

b. loss, diversion, or withholding of money associated with the Holdback;

c. loss of or injury to the value of the ex-MMA docket that JJJ built and financed;

d. unreimbursed costs and expenses advanced by JJJ in excess of $300,000;

e.   additional expenses incurred in attempting to recover files, protect clients, preserve JJJ's rights, and respond to Defendants' conduct; and

f.   other actual, consequential, and pecuniary damages in amounts to be determined at trial.

227.   Defendants Sangisetty, Coussan and Magee acted knowingly, intentionally, maliciously, and with conscious indifference to Plaintiffs' rights, and Defendants all benefited from participation in this common scheme. Plaintiffs therefore seek all available actual damages, consequential damages, exemplary damages, and other relief permitted by law.

## COUNT SIX

### BREACH OF FIDUCIARY DUTY
### (Against Defendant Sangisetty)

228.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

229.   Defendant Sangisetty owed fiduciary duties to Joy and JJJ arising from at least two distinct relationships.

230.   First, Sangisetty owed fiduciary duties to Joy and JJJ by virtue of the attorney-client relationship created when Joy retained Sangisetty to negotiate and draft the MMA secondment agreement and to advise JJJ in connection with the former MMA rescue project. In that role, Sangisetty owed duties of loyalty,

candor, confidentiality, honesty, full disclosure, fair dealing, and the obligation to place the interests of his client above his own.

231.    Second, Sangisetty owed fiduciary duties to Joy and JJJ by virtue of the co-counsel and joint-venture relationship that followed. As JJJ's co-counsel partner on the ex-MMA docket, Sangisetty owed duties of loyalty, good faith, fair dealing, truthful disclosure, and faithful performance consistent with the parties' agreements and the jointly represented clients' interests.

232.    Sangisetty breached those fiduciary duties in numerous ways, including but not limited to the following:

a.    **Using confidential client information against Joy and JJJ.** While acting as Joy's lawyer in the secondment transaction, Sangisetty obtained confidential and proprietary information regarding the economics, value, structure, financing, and strategic importance of the ex-MMA docket. Sangisetty later used that information against Joy and JJJ for his own benefit and for the benefit of Coussan, Magee, SLF, and related actors.

b.    **Misrepresenting material legal and business facts.** Sangisetty misrepresented or concealed material information regarding Louisiana fee-sharing rules, the structure of the venture, the intended recognition of JJJ's contractual interests, and his own intentions concerning loyalty, reimbursement, equal participation, and performance under the venture.

c.   **Acting in conflict with Joy and JJJ's interests.** Rather than protecting Joy and JJJ's interests, Sangisetty aligned himself with other actors seeking to reduce, divert, or capture JJJ's contractual fee interests and operational control over the docket.

d.   **Failing to honor and protect the Holdback arrangement.** Sangisetty negotiated the secondment agreement on JJJ's behalf, including the Holdback structure that made the project economically viable. Sangisetty later acted contrary to JJJ's interests with respect to those funds and used the holdback issue as a source of leverage against JJJ rather than honoring the arrangement he had negotiated as JJJ's lawyer.

e.   **Participating in the exclusion of JJJ from jointly represented matters.** Instead of operating as a faithful co-counsel partner, Sangisetty participated in restricting JJJ's access to files, settlement information, disbursement data, and communications necessary for JJJ to supervise the matters and protect both its own rights and the clients' interests.

f.   **Omitting or withholding JJJ's fee interests and reimbursement rights.** Sangisetty participated in or directed settlement and disbursement practices that omitted JJJ's contractual fee share, withheld reimbursement of JJJ's advanced

costs and expenses, and used control over the money generated by the docket as leverage against JJJ.

g. **Conspiring with others against Joy and JJJ despite fiduciary obligations**. Sangisetty knowingly acted in concert with Coussan, Magee, and others to pressure JJJ, interfere with JJJ's client relationships, and acquire or maintain control over the economic benefits of the ex-MMA docket in derogation of Sangisetty's fiduciary duties.

233. Sangisetty's fiduciary breaches were knowing, intentional, and disloyal. They were not mere mistakes or contract disputes. They involved the misuse of a position of trust first created through an attorney-client relationship and then reinforced through a co-counsel and joint-venture relationship.

234. As a direct and proximate result of Sangisetty's breaches of fiduciary duty, Plaintiffs suffered substantial injury, including but not limited to:

a. loss, diversion, or withholding of JJJ's contractual fee interests;

b. loss, diversion, or withholding of funds associated with the Holdback;

c. unreimbursed costs and expenses advanced by JJJ;

d. loss of control over the value and economic benefit of the ex-MMA docket that JJJ originated and financed;

e. additional legal and operational costs incurred to recover access, protect clients, and preserve JJJ's rights; and

f.    other actual, consequential, and pecuniary damages in amounts to be determined at trial.

235.   Because Sangisetty acted knowingly, intentionally, maliciously, and in conscious disregard of duties arising from relationships of trust and confidence, Plaintiffs seek all available legal and equitable remedies, including actual damages, benefit-of-the-bargain damages where applicable, disgorgement, forfeiture of improperly obtained benefits, exemplary damages, and all other relief authorized by law.

## COUNT SEVEN

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Defendants Coussan, Magee, Boyles, Olmsted, B. Long, and M. Long)**

236.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

237.   As alleged above, Defendant Sangisetty owed fiduciary duties to Joy and JJJ arising from his attorney-client relationship with Joy in the MMA secondment transaction and from his later co-counsel and joint-venture relationship with JJJ on the former MMA docket. Sangisetty breached those fiduciary duties in numerous material respects.

238.   Defendants Coussan, Magee, Boyles, Olmsted, B. Long, and M. Long knew of Sangisetty's fiduciary relationship with Joy and JJJ, or at a minimum knew facts that made the existence of Sangisetty's duties unmistakable. Among other things, they knew that:

a.  Sangisetty had first entered the project as Joy's attorney in connection with the MMA secondment;

b.  Sangisetty later acted as JJJ's co-counsel and joint-venture partner on the ex-MMA matters;

c.  JJJ had originated, financed, and contractually shared the docket with SLF;

d.  JJJ remained jointly responsible for the clients under the governing fee agreements; and

e.  Sangisetty owed duties of loyalty, candor, good faith, and fair dealing to Joy and JJJ.

239. Despite that knowledge, these Defendants knowingly provided substantial assistance, encouragement, and support to Sangisetty's fiduciary breaches.

240. That assistance included, among other things:

a.  Pressuring Sangisetty to abandon JJJ's interests and align with them instead. Coussan and Magee exerted ongoing pressure on Sangisetty to disregard JJJ's contractual and fiduciary rights, to favor their own financial demands, and to treat JJJ's interests as negotiable or expendable.

b.  Participating in demands for JJJ's fee interests and other property rights. Coussan and Magee joined or supported repeated efforts to force Joy to surrender parts of JJJ's fee interests, despite knowing

that those interests were governed by written client contracts and that Sangisetty, as JJJ's co-counsel partner, owed duties not to undermine them.

c.   Participating in client-interference efforts that were inconsistent with Sangisetty's duties. Boyles, Olmsted, B. Long, and M. Long participated in handling matters, communications, and operational tasks in a manner that furthered the exclusion of JJJ from the representation and undermined JJJ's client relationships, all while knowing that JJJ remained co-counsel and that Sangisetty owed duties to JJJ.

d.   Facilitating the restriction of JJJ's access to files, data, and settlement information. These Defendants knowingly participated in or benefited from the concealment of case information, the withholding of disbursement records, the abandonment of shared systems, and the exclusion of JJJ from operational access—conduct that furthered Sangisetty's breach of loyalty and good faith.

e.   Aiding the withholding or diversion of JJJ's money. These Defendants knew or should have known that funds associated with JJJ's contractual fee interests, reimbursable costs and expenses, and the Holdback belonged in whole or in part to JJJ, yet they nevertheless participated in, accepted benefits from, or helped maintain the withholding or diversion of those funds.

Plaintiffs' Complaint                                        Page **88** of **111**

f.  Assisting Sangisetty in acting against a former client and current co-counsel partner. These Defendants knowingly helped Sangisetty convert confidential knowledge, operational leverage, and control over the files into adverse action against Joy and JJJ, even though Sangisetty's duties required the opposite.

241. The substantial assistance provided by these Defendants was a material factor in enabling Sangisetty's breaches. Absent their participation, encouragement, pressure, coordination, and operational support, the fiduciary breaches alleged herein would not have occurred in the same form or with the same effect.

242. As a direct and proximate result of Defendants' aiding and abetting of Sangisetty's breach of fiduciary duty, Plaintiffs suffered substantial injury, including but not limited to:

a.  loss, diversion, or withholding of JJJ's contractual fee interests;

b.  loss, diversion, or withholding of funds associated with the Holdback;

c.  unreimbursed costs and expenses advanced by JJJ;

d.  loss of control over and economic benefit from the ex-MMA docket;

e.  additional legal and operational costs incurred to protect clients, recover access, and preserve JJJ's rights; and

f.  other actual, consequential, and pecuniary damages in amounts to be determined at trial.

243.  Plaintiffs therefore seek all relief available at law and in equity, including actual damages, disgorgement, exemplary damages where authorized, and all other appropriate relief.

## COUNT EIGHT

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (Against All Defendants)

244.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

245.  At all relevant times, Plaintiffs had valid and enforceable contracts and contractual relationships, including but not limited to:

a.    the June 22, 2023 MMA-JJJ Secondment Agreement, including the 45% Holdback structure negotiated for JJJ's protection;

b.    the July 2, 2023 JJJ-SLF Joint Venture Agreement and the related agreements governing the parties' relationship;

c.    the written contingency-fee agreements executed by the former MMA clients who retained JJJ and SLF, including the agreements fixing the 50/50 fee split, joint responsibility, client-consent requirements for additional counsel, and disbursement-transparency provisions; and

d.    the agreements governing project-related services and support obtained for the benefit of the JJJ-SLF venture, including litigation-support and operational arrangements funded by JJJ.

246. Defendants knew of these contracts. Defendants either participated in negotiating them, operated under them, benefited from them, communicated about them, or were otherwise aware of their existence and material terms.

247. Defendants intentionally interfered with those contracts in numerous ways, including but not limited to the following:

**Interference with the MMA-JJJ Secondment Agreement**

248. Defendants interfered with the MMA-JJJ Secondment Agreement, including the Holdback arrangement, by acting to undermine JJJ's contractual rights in the ex-MMA docket and by wrongfully withholding, diverting, impairing, or using as leverage money subject to or affected by that agreement.

249. Sangisetty, despite having negotiated that arrangement as Joy's attorney, later acted inconsistently with JJJ's rights under it. Coussan, Magee, and others knowingly encouraged, exploited, or benefited from that interference.

**Interference with the JJJ-SLF Venture Agreements**

250. Defendants interfered with the JJJ-SLF joint-venture and co-counsel arrangements by pressuring Joy to surrender parts of JJJ's contractual interests, by attempting to insert non-client-approved participants into the economics of the venture, by excluding JJJ from operational access and case information, and by preventing JJJ from receiving the benefits of its agreements with SLF.

251. Coussan and Magee, although not parties to the governing client contracts as participating counsel, intentionally sought to alter the economic

structure of the venture for their own benefit and pressured Sangisetty to act in derogation of SLF's contractual obligations to JJJ.

## Interference with the Client Fee Agreements

252. Defendants also interfered with the written contingency-fee agreements between JJJ, SLF, and the nearly 1,000 former MMA clients.

253. Those client agreements were central to the project. They identified JJJ and SLF as counsel, fixed the fee division, required transparency in disbursements, and required client consent before additional lawyers or firms could be brought into the representation.

254. Defendants intentionally interfered with those agreements by, among other things:

   a.    telling clients that JJJ "cannot represent" them because JJJ is a Texas firm;

   b.    attempting to alienate clients from Joy and JJJ;

   c.    excluding JJJ from communications, file access, and settlement activity necessary to perform under the client contracts;

   d.    omitting JJJ's contractual fee interests from settlement statements and disbursement-related materials;

   e.    proceeding with mediation, settlement, or withdrawal activity without proper notice to JJJ; and

Plaintiffs' Complaint                                        Page **92** of **111**

f.    otherwise preventing or discouraging the clients from receiving the joint representation and transparency promised in the written agreements.

255.    Defendants did this intentionally, knowingly, and without legal justification, for the purpose of depriving JJJ of the benefits of its contracts and preserving control over the cases and money for themselves.

### Interference with Project-Support Agreements

256.    Defendants also interfered with agreements governing the operational and litigation-support services used to build and maintain the ex-MMA docket, including support arrangements funded by JJJ for the benefit of the venture. Defendants attacked and undermined those relationships, not for legitimate business reasons, but to damage JJJ's operational capacity, isolate JJJ from the venture, and destroy relationships necessary for JJJ to continue protecting the docket it had created.

257.    Defendants' interference was willful and intentional. Defendants desired to interfere with these contracts or knew that interference was substantially certain to occur as a result of their conduct.

258.    Defendants' conduct was a proximate cause of injury to Plaintiffs. As a direct and proximate result of Defendants' tortious interference with existing contracts, Plaintiffs have suffered damages, including but not limited to:

a.    loss, diversion, or withholding of contractual fee interests;

b.    loss, diversion, or withholding of funds associated with the Holdback;

c.    unreimbursed costs and expenses advanced by JJJ;

d.    loss of the benefits of the co-counsel, joint-venture, and client-fee agreements;

e.    disruption of JJJ's relationships with its clients and service providers;

f.    additional legal and operational costs incurred to protect JJJ's rights and restore access; and

g.    other actual, consequential, and pecuniary damages as applicable.

### Interference with the Xpand Legal Agreement

259.    Defendants also intentionally interfered with the agreement under which Xpand Legal provided litigation-support and operational services for the benefit of the JJJ-SLF venture. Defendants requested and accepted those services, consumed their benefit in building and operating the docket, and then manufactured accusations against Xpand as a pretext for nonpayment. Defendants further weaponized litigation against Xpand in order to damage JJJ's operational support network, isolate JJJ from infrastructure essential to the project, and preserve Defendants' leverage over the ex-MMA docket and associated fee streams.

260.    Defendants acted intentionally, maliciously, and without privilege or justification. Plaintiffs therefore seek all available relief, including actual

damages, consequential damages, exemplary damages where authorized, and all other relief permitted by law.

## COUNT NINE

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (Against All Defendants)

261. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

262. At the time the events alleged in this Complaint began, JJJ had a reasonable probability of entering into additional and more favorable business relationships in connection with the former MMA matters and related litigation support.

263. Those prospective business relationships included, among others:

a. prospective co-counsel or local-counsel relationships with other Louisiana lawyers or firms, both before and after the Hurricane Ida deadline;

b. expanded or continuing business relationships with litigation-support and operational vendors assisting JJJ in large-scale plaintiff-side matters; and

c. additional business opportunities arising from JJJ's ability to continue building, supervising, and monetizing the ex-MMA docket through lawful and more favorable arrangements.

Plaintiffs' Complaint                                      Page **95** of **111**

264. Defendants knew of these prospective relationships and opportunities. They knew that Joy and JJJ were actively considering alternative Louisiana counsel, other operating structures, and other business arrangements that would have reduced or eliminated Defendants' leverage over the ex-MMA docket.

265. Defendants intentionally interfered with those prospective relationships in numerous ways.

266. First, Sangisetty, Coussan, and Magee interfered with JJJ's prospective relationships with other Louisiana counsel by misrepresenting Louisiana law, pressuring Joy not to pursue alternative lawyers, and creating the false impression that JJJ could not succeed in Louisiana without the particular arrangement Coussan had assembled Coussan used his relationship with Joy, together with his status and perceived access within Louisiana, to discourage Joy from moving to other Louisiana lawyers or building a different structure.

267. Second, Defendants interfered with JJJ's prospective ability to continue developing and exploiting the ex-MMA docket through lawful and more favorable business arrangements by locking JJJ into a compromised structure long enough for the docket to become valuable and then excluding JJJ from the control and economic benefits of that docket.

268. Third, Defendants interfered with JJJ's ongoing and future relationships with project-support vendors and consultants by manufacturing

disputes, making false accusations, and undermining those relationships for strategic reasons. Defendants did so not merely to attack a vendor, but to weaken JJJ operationally, sever JJJ from the systems and support necessary to manage the docket, and deter future collaboration on this and other matters.

269.    Fourth, Defendants' conduct toward Xpand also interfered with JJJ's prospective business relationships by damaging JJJ's ongoing and future ability to work with litigation-support vendors and consultants in this and other high-volume matters. Defendants knowingly made false accusations and used coercive litigation tactics against Xpand to impair JJJ's vendor relationships, to threaten collateral damage to unrelated JJJ dockets, and to discourage future support relationships necessary to JJJ's business model.

270. Fifth, Defendants interfered with JJJ's prospective business relationships with current and future clients by falsely telling jointly represented clients that JJJ could not represent them, by portraying JJJ as unauthorized or ineffective, and by attempting to erode the confidence of clients who had specifically retained JJJ. This conduct not only harmed existing relationships, but also damaged JJJ's ability to preserve and expand business opportunities arising from those relationships.

271.    Defendants' conduct was independently tortious or unlawful. It included, among other things, fraud, defamation, business disparagement, extortionate conduct, interference with existing contracts, breach of fiduciary

duty, aiding and abetting fiduciary breach, and the broader wrongful conduct alleged throughout this Complaint.

272. Defendants acted with a conscious desire to prevent these business relationships from occurring or knew that interference with them was substantially certain to result from their conduct.

273. As a direct and proximate result of Defendants' tortious interference with prospective business relations, Plaintiffs suffered damages, including but not limited to:

    a.    the loss of more favorable co-counsel and local-counsel opportunities;

    b.    the loss of more favorable economic arrangements for the handling of former MMA matters;

    c.    lost profits and lost attorney's fees;

    d.    impairment of JJJ's ability to continue developing and monetizing the ex-MMA docket through lawful means;

    e.    disruption of current and future vendor and support relationships;

    f.    damage to JJJ's goodwill and professional standing in ongoing and future business opportunities; and

    g.    other actual, consequential, and pecuniary damages in amounts to be determined at trial.

274. Plaintiffs therefore seek all relief available at law and in equity, including actual damages, consequential damages, exemplary damages where authorized, and all other appropriate relief.

## COUNT TEN

## CONVERSION
### (Against All Defendants)

275. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

276. Plaintiffs had legal rights to, ownership interests in, or the immediate right to possess specific money and property that Defendants wrongfully exercised dominion and control over the $825,000 in IOLTA funds.

277. The IOLTA funds were deposited into an IOLTA for safe-keeping, are sufficiently identifiable, and were intended to be kept segregated. SLF has no title claim to such funds.

278. Defendants wrongfully exercised dominion and control over that money and property in a manner inconsistent with Plaintiffs' rights. Among other things, Defendants:

   a.   withheld or diverted JJJ's contractual fee interests from settlements and recoveries in jointly represented matters;

   b.   omitted JJJ's fee interests from settlement statements and disbursement-related documents;

   c.   withheld or exercised control over funds associated with the Holdback despite JJJ's rights in or relating to those funds;

   d.   refused to reimburse JJJ for advanced costs and expenses despite JJJ's rights to reimbursement;

e.    locked JJJ out of files, data, systems, and information necessary to protect and exercise its rights in the docket; and

f.    retained or distributed money and related economic benefits that rightfully belonged, in whole or in part, to JJJ.

279.   Defendants knowingly accepted, retained, used, or benefited from money and property belonging to JJJ despite knowing, or being on notice, that JJJ had superior rights to possession or payment.

280.   Plaintiffs demanded access, turnover, accounting, recognition of their fee interests, reimbursement of expenses, and restoration of their rights. Defendants refused.

281.   As a direct and proximate result of Defendants' conversion, Plaintiffs suffered damages, including but not limited to:

a.    the value of converted attorney's fees;

b.    the value of converted or withheld holdback-related funds;

c.    the value of unreimbursed costs and expenses;

d.    the value of converted economic interests associated with the ex-MMA docket;

e.    additional costs incurred in attempting to recover the converted property and protect Plaintiffs' rights; and

f.    other actual, consequential, and pecuniary damages in amounts to be determined at trial.

282. Defendants' conduct was willful, malicious, and in conscious disregard of Plaintiffs' rights. Plaintiffs therefore seek all available relief, including actual damages, exemplary damages where authorized, prejudgment interest, and all other legal and equitable relief to which they are entitled.

## COUNT ELEVEN

### CIVIL CONSPIRACY
### (Against All Defendants)

283. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

284. Defendants combined, associated, agreed, and acted together to accomplish unlawful objectives and to accomplish lawful objectives by unlawful means.

285. The object of the conspiracy was to deprive JJJ of the economic and practical benefits of the ex-MMA hurricane docket that JJJ originated, financed, organized, and jointly represented, including:

   a.   JJJ's contractual fee interests;

   b.   JJJ's rights to reimbursement of advanced costs and expenses;

   c.   JJJ's interests in money associated with the Holdback;

   d.   JJJ's access to files, systems, and settlement information necessary to protect its rights and its clients; and

   e.   JJJ's existing and prospective business opportunities arising from the docket.

286. There was a meeting of the minds among Defendants on the course of action alleged in this Complaint. That agreement is shown by, among other things:

a. the coordinated manner in which Coussan introduced Joy to Sangisetty and Magee and pressed Joy to stay within the arrangement Coussan had assembled;

b. Sangisetty's shift from Joy's attorney in the secondment transaction to a co-counsel partner who allegedly aligned himself with others seeking to diminish or capture JJJ's interests;

c. repeated coordinated efforts to pressure Joy to surrender portions of JJJ's contractual fee interests to persons or firms not identified in the client agreements;

d. the repeated use of the same or substantially similar false "cannot represent" statements to jointly represented clients;

e. the collective abandonment of shared systems, the coordinated restriction of JJJ's access to files and settlement information, and the refusal to provide accountings and disbursement transparency;

f. the coordinated use of mediations, settlement practices, disbursement omissions, lockouts, and litigation tactics to preserve Defendants' control over the docket and related funds; and

g. the continuing refusal to recognize and pay JJJ's interests even after demand.

287. In furtherance of the conspiracy, Defendants committed numerous unlawful overt acts, including but not limited to:

a.    fraud and fraudulent concealment;

b.    breach of fiduciary duty and aiding and abetting fiduciary breach;

c.    tortious interference with existing contracts;

d.    tortious interference with prospective business relations;

e.    conversion;

f.    defamatory and disparaging statements to clients and others;

g.    coercive demands for JJJ's money and contractual interests;

h.    exclusion of JJJ from files, clients, and settlement processes; and

i.    the withholding, diversion, and attempted capture of money and property belonging in whole or in part to JJJ.

288. Each Defendant knew the general objective of the conspiracy and intended to participate in it or to assist in its accomplishment. Each Defendant played a knowing role in the overall scheme, whether as an architect, pressure source, operational principal, client-facing actor, administrative participant, or organizational vehicle.

289. The manufactured Xpand dispute further evidences the conspiracy alleged herein. Defendants coordinated false accusations, harassment, and litigation against Xpand after accepting the benefit of Xpand's services, not to resolve a legitimate dispute, but to isolate JJJ, destroy project infrastructure, and

increase Defendants' leverage over the ex-MMA docket and the money associated with it.

290. As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs suffered damages, including but not limited to:

a. loss, diversion, or withholding of contractual fee interests;

b. loss, diversion, or withholding of money associated with the Holdback;

c. unreimbursed costs and expenses advanced by JJJ;

d. loss of control over and economic benefit from the ex-MMA docket;

e. injury to business relationships, goodwill, and business opportunities;

f. additional legal and operational expenses incurred to protect clients and recover rights; and

g. other actual, consequential, and pecuniary damages in amounts to be determined at trial.

291. Defendants acted intentionally, maliciously, and in conscious disregard of Plaintiffs' rights. Plaintiffs therefore seek all available damages and equitable relief, including actual damages, consequential damages, exemplary damages where authorized, and all other appropriate relief.

## COUNT TWELVE

### DEFAMATION
### (Against Defendants Sangisetty, Magee, Boyles, B. Long, and M. Long)

292. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

293. Defendants Sangisetty, Magee, Boyles, B. Long, and M. Long published false statements of fact concerning Joy and JJJ to third parties, including jointly represented clients and others, that tended to injure Plaintiffs in their office, profession, business, and reputation.

294. Among other things, Defendants published statements asserting or implying that:

    a.    JJJ "cannot represent" jointly represented clients because JJJ is a Texas firm and not licensed in Louisiana;

    b.    Joy and JJJ lacked authority to provide legal advice to clients who had retained JJJ and SLF under written fee agreements;

    c.    JJJ was improperly interfering in matters in which it had no legitimate role, despite JJJ's contractual status as joint counsel;

    d.    JJJ's conduct or business practices were improper, unethical, unauthorized, or comparable to the kind of misconduct that had already traumatized former MMA clients; and

    e.    clients would be harmed financially if they listened to Joy or followed JJJ's advice rather than Defendants' preferred course.

295. These statements were false when made.

296. The written fee agreements identified JJJ and SLF as counsel. JJJ remained jointly responsible for the representation. JJJ worked with Louisiana-licensed counsel where necessary. JJJ had contractual, professional, and economic rights in the matters about which Defendants were speaking. Statements that JJJ "cannot represent" its own clients, or that JJJ lacked authority to advise them, were therefore false.

297. These statements were published to third parties, including clients such as Client A, Client B, Client C-Rep on behalf of Client C, and Client D, among others. The repetition of the same basic "cannot represent" script across multiple client matters was not accidental, but deliberate.

298. The defamatory statements were made negligently at a minimum, and in many instances with actual malice—that is, with knowledge of falsity or reckless disregard for truth. Defendants made these statements intentionally to damage Joy and JJJ in the eyes of their own clients, to undermine client trust, to isolate JJJ from ongoing matters, and to preserve Defendants' control over the docket and related fee streams.

299. The statements were defamatory per se because they injured Plaintiffs in their profession, business, and fitness to serve as counsel. They accused or implied professional incompetence, lack of authority, unethical conduct, or disqualifying legal incapacity in the representation of clients.

300. As a direct and proximate result of Defendants' defamatory publications, Plaintiffs suffered damages, including but not limited to:

a.    injury to professional reputation;

b.    loss of client trust and confidence;

c.    impairment of existing client relationships;

d.    pecuniary loss associated with disrupted or damaged representations;

e.    additional costs incurred to correct falsehoods and reassure clients; and

f.    other actual, consequential, and reputational damages in amounts to be determined at trial.

301. Because Defendants acted intentionally, maliciously, and with knowledge of or reckless disregard for the falsity of their statements, Plaintiffs seek all relief available under Texas law, including actual damages, presumed damages where applicable, exemplary damages where authorized, injunctive relief to prevent further false statements, and all other appropriate legal and equitable relief.

## COUNT THIRTEEN

### BUSINESS DISPARAGEMENT
### (Against Defendants Sangisetty, Magee, Boyles, B. Long, and M. Long)

302. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs' Complaint                                                Page **107** of **111**

303. Defendants Sangisetty, Magee, Boyles, B. Long, and M. Long published false and disparaging statements about Joy and JJJ's business, services, authority, and economic interests to third parties, including jointly represented clients and others.

304. Among other things, Defendants stated or implied that:

a. JJJ could not lawfully represent jointly represented clients in Louisiana;

b. Joy and JJJ lacked authority to advise or communicate with clients who had retained them;

c. JJJ was improperly interfering in client matters in which it had no legitimate role;

d. JJJ's involvement was harmful, unauthorized, or detrimental to client recoveries; and

e. clients would suffer economic harm if they followed Joy's or JJJ's advice rather than Defendants' preferred course.

305. These statements were false.

306. Defendants published these statements without privilege and with malice. Defendants knew the statements were false, acted with reckless disregard for their truth, or acted with ill will and the specific intent to interfere with JJJ's economic interests, client relationships, and fee rights.

307. The purpose and natural effect of these statements was to damage JJJ's business by turning JJJ's own clients against it, undermining client confidence in Joy and JJJ, discouraging clients from communicating with JJJ, and preserving Defendants' unilateral control over the former MMA docket, settlement process, and associated fee streams.

308. Defendants' disparaging publications caused special damages and specific pecuniary loss. Among other things, the statements:

a.   interfered with JJJ's ability to maintain and benefit from its relationships with jointly represented clients;

b.   impaired JJJ's ability to protect and realize its contractual fee interests;

c.   contributed to low-value settlements, concealed settlements, or settlements handled without proper participation by JJJ;

d.   increased the costs JJJ had to incur to correct falsehoods, reestablish client trust, and protect its rights; and

e.   damaged JJJ's goodwill and economic interests in the ex-MMA docket and related business opportunities.

309. As a direct and proximate result of Defendants' business disparagement, Plaintiffs have suffered actual, consequential, and pecuniary damages in amounts to be determined at trial.

310. Because Defendants acted intentionally, maliciously, and with conscious disregard of Plaintiffs' rights and economic interests, Plaintiffs seek all relief available at law and in equity, including actual damages, special damages, exemplary damages where authorized, and all other appropriate relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and award:

A.   Actual damages in an amount to be determined at trial;

B.   Treble damages under 18 U.S.C. § 1964(c);

C.   Exemplary damages where authorized by Texas law;

D.   Disgorgement of fees and benefits obtained through breach of fiduciary duty;

E.   Prejudgment and postjudgment interest;

F.   Reasonable attorney's fees and costs necessarily incurred in bringing suit;

G.   An accounting of all settlement funds, costs, and disbursements arising from the jointly represented matters;

H.   Injunctive relief restoring JJJ's access to client files, settlement information, disbursement data; restraining defendants from disbursing disputed funds held in trust to third parties; and restraining further defamatory statements;

I.   Any other such relief that the Court finds just and equitable.

Plaintiffs' Complaint                                                    Page **110** of **111**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims.

Dated: May 21, 2026

Respectfully submitted,

JASON JOY & ASSOCIATES, PLLC

_____

Jason J. Joy *(TX Bar No. 24058932)*
jason@jasonjoylaw.com
Colin G. Wood *(TX Bar No. 24082535)*
colin@jasonjoylaw.com
909 Texas Street, Suite 1801
Houston, TX 77002
Tel: (713) 221-6500
Fax: (713) 221-1717